UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Terri Baker *et al*

                    Plaintiffs,

v.                                              Case No. 5:23-cv-04022-TC-TJJ
                                                Request for Oral Argument
Randall Watson *et al*                          D. Kan. Rule 7.2

                    Defendants

**PLAINTIFF TERRI BAKER, S.B., AND HERITAGE HOUSE MEMORANDUM IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT
EDUCATION COMMISSIONER RANDALL WATSON**

**OVERVIEW**

Kansas demands that its public school system be a godless one.  But it goes

beyond that arena into a parent's private school choice.  It reaches out beyond the

public into the private and demands those private schools also be godless – that is, if

parents or those schools want the benefit of special needs services.  The Kansas Board

of Education with its Department of Education's regulation K.A.R. 91-4048(c)(2),

together with the legislation enacted in K.S.A. 72-3421, and K.S.A. 72-3463, are in

violation of the rights of these plaintiffs under the U.S. Constitution.

**FACTS**

**BOOKS FOR DYSLEXIA**

1. Terri Baker's (Terri) son S.B. is diagnosed with dyslexia and has long had an

Individualized Education Program (IEP) established for years. Ex. 33 p.35:21-

p.39:15; Ex. 33 p.58:19-p.61:25.

2. S.B. was evaluated and diagnosed with dyslexia by the Jordan Psychological Assessment Center. Ex. 33 p.58:19-p.61:25.

3. Terri's sister Kari is a special education teacher who has assisted S.B.'s parents in testing and helping S.B. in ways to get S.B. to read and comprehend using particular kinds of books. Ex. 33 p.45:18-p.46:4; p.53:19-p.54:25; p.76:1-25.

4. S.B. also had a dysgraphia diagnosis but Kari said it was a term that can be widely misinterpreted.  Ex. 33 p.87:14-24.

5. The books that help dyslexic students like S.B. use less words and more pictures similar to comic books. Ex. A.




6. Terri uses those books as a part of her Christian practice, which not only helps S.B. to read and comprehend words and story concepts, at the same time these books are used by Terri to teach him Christian history and precepts. Ex. A. p.2

7. S.B.'s reading and comprehension has vastly improved using these books. Ex. A. p.3.

8. S.B.'s school district Blue Valley says it must follow the Kansas Department of Education's regulation and will not provide S.B. any special needs or related services while S.B. is learning using these kinds of faith-based books. Ex. A p.2 & 13; Ex. 34 p.216:23-p.218:2; p.56:9-p.57:20; p.59:21; p.138:22-p.139:2; p.216:23-p.218:2; p.145:2-6.

## HOUSE BILL NO. 2567

9. Under Senate Sub. for HB 2567 which takes effect for the 2024-2025 Kansas school year, each board of education of a school district shall allow any child to enroll part-time in the school district to allow the student to attend any courses, programs or services offered by the school district if the child: (A) Is also enrolled in a nonaccredited private elementary or secondary school pursuant to K.S.A. 72-4345, and amendments thereto, or in any other private, denominational or parochial school pursuant to the provisions of subsection (a); (B) requests to enroll part-time in the school district; and (C) meets the age of eligibility requirements for school attendance pursuant to K.S.A. 72-3118, and amendments thereto. Ex. 3.p.20.

### S.B. |TERRI BAKER | HERITAGE HOUSE |BLUE VALLEY

10. Terri and her son S.B. (an alias) reside at 6732 West 185th Terrace Stilwell Kansas which is in the Blue Valley school district. Ex. 33 p.6:5-10;p.29:13-15.

11. S.B. had been enrolled Blue Valley when the Covid-19 pandemic began S.B. and was homeschooled. Ex. 33:8-p.34:11.

12. Terri is a Christian and has attended Bible School. Ex. 33 p.22:17-18: p.15:19-23.

13. Terri's religious faith affects her parenting of S.B. Ex. 33 p.23:16-p.26:9.

14. S.B. has attended Whitefield Christian Academy and Terri unsuccessfully attempted to later enroll S.B. in other Christian schools. Ex. 33 p.62:12-p.66:7.

15. Because S.B. had dyslexia it made it difficult to get S.B. enrolled in a private Christian school. Ex. 33 p.68:8-13.

16. When asked what was wrong with Blue Valley Terri said "the environment" and that it was "godless." Ex. 33 p.68:11-23.

17. Terri wanted S.B. to have push in special need services in S.B.'s private school general education curriculum. Ex. 33 p.74:18-23; p.78:9-13-25; p.92:24-p.93:24.

18. Terri's understanding is that S.B. needed to be enrolled at Blue Valley in order to get services or be tested but that Blue Valley would not enroll S.B. Ex. 33 p.81:13-p.82:14; p.86:17-21; p.90:6-10; Ex. 34 p.211:1-p.215:4; p.216:2-21.

19. Terri did not agree to the statement that "Blue Valley hasn't done anything to stop you from obtaining special education services at a school of your choosing." Ex. 33 p.90:1-5.

20. S.B. has been and continues to be enrolled in a registered non-accredited private school called Heritage House. Ex. 33 p.89:4-8; p.99:12-19; p.102:19-22.

21. Heritage House is a 501(3)(c) non-profit organization which also functions as a school. Ex. 33 p.94:1-9; p.97:6-12.

22. Heritage House not only qualifies as a "private, denominational or parochial school" under Senate Sub. for HB 2567 it also qualifies as a non-accredited private school. Ex. 33 p.94:1-9; p.97:6-12; Ex.21; Ex. 34 p.129:10-p.130:3; Ex. 33 p.98:1-p.99:10; p.109:3-5.

23. Heritage House and Baumgarten Academy are registered with the Kansas Department of Education (KSDE) as a non-accredited private school. Ex.21; Ex. 34 p.129:10-p.130:3; Ex. 33 p.98:1-p.99:10; p.109:3-5.

24. S.B. was receiving assistance from Heritage House when S.B. attended Wolf Springs Elementary in the Blue Valley School District. Ex. 33 p.104:12-21.

25. Terri has made a request to the Blue Valley School District for part-time enrollment for S.B. pursuant to Senate Substitute for HOUSE BILL No. 2567 so that S.B. can receive the special needs services designated on S.B.'s I.E.P.; Ex. 36.

26. S.B. must be enrolled in the Blue Valley School District to receive his Free Appropriate Public Education (FAPE) from Blue Valley.  Ex. 34 p. 31:1-6; p.32:10-18; p.139:13-23; p.182:10-23.

27. Blue Valley has un-enrolled S.B. without the knowledge or consent of S.B.'s parents. Ex. 34 p.181:25-p.182:9.

28. Terri has made numerous requests to the Blue Valley School District to enroll S.B. in the Blue Valley School District. Ex. 33 p.128:20-p.129:20.

29. Blue Valley enforces K.A.R. 91-40-48's requirement that "special education and related services provided to exceptional children enrolled in private schools are provided in a secular and nonideological manner." Ex. 33 p.134:14-p.135:18.

30. Chapter 14 of the Kansas State Department of Education Kansas Special Education Process Handbook states that "State law allows for services to be provided at either the public or private school, but forbids the provision of special education and related services 'in connection with religious courses, devotional exercises, religious training, or any other religious activity.'"

31. The Blue Valley Unified School District (BV) is a local educational agency that, under Kansas law, provides special education and related services and contracts with nonpublic schools as possible placements for exceptional students. Once a student with a disability is placed, BV is responsible for reimbursing the nonpublic school the cost of tuition and special education and related services. BV receives its federal and state special education funding from Kansas. See 20 U.S.C. § 1413(a). Ex. 36 p.18.

32. Blue Valley enforces Chapter 14 of the Special Education Handbook of KSDE which contains the language "no special education services shall be provided in connection with religious courses, devotional exercises, religious training or any other religious activity." Ex. 34 p.216:23-p.218:2.

33. Blue Valley will not provide any push-in special needs services for S.B. in his non-accredited private school. Ex. 34 p.56:9-p.57:20; p.59:21; p.138:22-p.139:2.

34. Blue Valley will not provide any special needs services to S.B. in S.B.'s non-secular general education curriculum because of K.A.R. 91-40-48 and K.S.A. 72-3463. Ex. 34 p.216:23-p.218:2; p.145:2-6.

35. When Blue Valley un-enrolled S.B. it changed S.B.'s access to his special education services. Ex. 34 p.165:4-21.

KANSAS DEPARTMENT OF EDUCATION

36. Randall D. Watson has been appointed by the Kansas State Board of Education as Commissioner of Education. Ex. 35, p.7:11-24; Ex.2 (Kansas Department of Education webpage).

37. Dr. Watson represents the State Board of Education and has general oversight of this agency and education functions that align with the Kansas constitution. Ex. 35 p.10:22-24. Ex. 1 (Kansas Department of Education Web publication marked as Ex. 1 in Dr. Watson's deposition); Ex. 35 p.6:17-23.

38. Dr. Watson's office "has the ultimate responsibility for the entire agency and directly oversees those agency functions that provide services to the entire agency." Ex. 35, p.7:11-24.

39. Dr. Watson oversees the Division of Learning Services in which Dr. Ben Proctor serves as Deputy Commissioner which has oversight over Special Education and Title Services. Ex. 35, p.8:15-20.

40. Dr. Watson has enforcement and implementation obligations regarding the State Board of Education regulations as set out in the Kansas State Board of Education Policies which was marked as Exhibit 4 in Dr. Watson's deposition.  Ex. 35 p.10:1-7; p.14:3-p.15:14; Ex. 4, pp.9 & 25.

41.  The responsibility of the Board is to establish policies, leaving implementation to the Commissioner. Ex. 4 p.25.

42. Under K.A.R. 91-40-43, Dr. Watson's Office of Commissioner is required to implement and enforce this 91-40-43 which requires school boards to provide special needs services to exceptional children residing in the school board's district. Ex. 18.

43. K.S.A. 72-3463 states that "no special education services shall be provided in connection with religious courses, devotional exercises, religious training or any other religious activity." Ex. 11.

44. Under K.A.R. 91-40-48, the Kansas Department of Education requires each agency to "ensure that special education and related services provided to exceptional children enrolled in private schools are provided in a secular and nonideological manner." Ex. 17. Ex. 35 p.77:50 p.78:23.

45. Dr. Watson interprets the non-ideological prohibition as applying to religious ideology. Ex. 35 p.89:1-2.

46. When asked to admit or deny the statement that Dr. Watson, in his official capacity, interprets 91-40-48 to include everything that K.S.A. 72-3463 prohibits, he responded that he was "not able to admit or deny." Ex. 24 p.8 ¶17.

47. Dr. Randall D. Watson testified under oath that the Kansas Department of Education has not attempted any interpretation of K.S.A. 72-3463. Ex. 26 p.6, ¶15; Ex. 35 p.161:10-13.

48. Dr. Watson again stated he was "unable to answer" on behalf of the Kansas Department of Education as to whether Chapter 72 forbids the provision of special education and related services in connection with religious courses, devotional exercises, religious training, or any other religious activity." Ex. 26 p.6, ¶15; Ex. 35 p. 161:10-13.

49. In regards to the "nonideological" restriction, Dr. Watson admitted that it encompassed more than religious ideology although Dr. Watson applied it to religious ideology. Ex. 35 p.88:9-p.89:7.

50. Dr. Watson admitted that these services benefit the exceptional child. Ex. 35 p.83:13-18.

51. An exceptional child in the state of Kansas is always entitled to the services that are designated in the child's IEP when his parent has not withdrawn consent for the services. Ex. 35 p.171:15-24; p.174:10-p.175:7.

52. An exceptional student's IEP continues to exist irrespective of whether that child is enrolled in a public or private school. Ex. 35 p.141:1-5.

53. All homeschools are non-accredited private schools in Kansas. Ex.9; Ex. 35 p.35:13-22.

54. Heritage House and Baumgarten Academy are non-accredited private Kansas schools. Ex. 21; Ex. 35 p.129:6:p.130:3.

55. Homeschools meet the K.S.A. 72-4345 definition of a non-accredited private school. Ex. 26, p.4 ¶6: Ex.35 p.156: 9-12.

56. Once a non-accredited school is registered it meets the definition of a non-accredited private school. Ex. 35 p.131:11-15.

57. Unless a school is registered with the Commissioners' Office it does not qualify as a school meeting Kansas compulsory school attendance requirements. Ex. 35 pp.65:2-p.66:3.

58. Kansas non-accredited private schools must follow the Board of Education's regulations set forth by law. Ex. 9; Ex. 35, p.35:19-25.

59. The Commissioner maintains a list of registered non-accredited schools. Ex. 35 p.69:9-18.

60. The Commissioner imposes requirements upon non-accredited private schools through its registration process. Ex. 8; Ex. 9; Ex. 35 p.26: 22-p.27:25.

61. The Kansas Department of Education doesn't know if a non-accredited private school meets the definition of school under K.S.A. 72-3120(a)(2). Ex.35 p.190:3-7.

62. Dr. Watson testified his office, as a practice, applied a third category of the accredited and non-accredited private schools he called "homeschools." Ex. 35 p.28:1-p.29:15.

63. Dr. Watson said he classified non-accredited private schools into two categories: ones that look like a traditional brick-and-mortar and those that don't. Ex. 35 pp.30:3-p.32:16.

64. Non-accredited private schools Dr. Watson classifies as "homeschools" are still required by KSDE to have a "competent teacher," hours of instruction, as well as an official custodian of school records." Ex. 9.

65. The Office of Commissioner has ongoing jurisdiction over the exceptional child if the child is enrolled in a non-accredited private school. Ex. 35 p.54:19-23.

66. K.S.A. 72-3421 requires a parent to provide the special education and related services which are indicated on the child's IEP privately if her child does not attend school to receive those services.  Ex. 11.

67. In Kansas Department of Education Handbook, Chapter 1, it states that special education statutes "sets forth parental responsibilities. This law requires parents to see that their child with a disability (not giftedness) attends school so that their child can receive the special education and related services on the child's IEP, or to provide such services privately." Ex. 20; Ex. 35 p.100:22-p.101:15.

68. A parent may not revoke consent for the continued provision of a particular service or placement unless the child's IEP team certifies in writing that the child does not need a particular service or placement for which consent is being revoked in order to receive a free public education. Ex.31 p.4;   Ex. 35 p.191:10-25.

69. Dr. Watson could not explain how these services are provided privately. Ex. 35 p.102:20-p.103:22.

70. The Special Needs Handbook currently states that "Public schools are also not required to permit part-time enrollment of home schooled children for purposes of receiving special education and related services." Ex. 20.

71. The Special Needs Handbook currently states that "public schools are not required to provide special education and related services for home-schooled children" even though Kansas now provides for dual or part-time enrollment. Ex. 20; Ex. 35 p.114:17-p.117:9.

72. Page 149 of the Special Needs Handbook authored by the Commissioner states that "K.S.A.72-3421 gives parents of a child with a disability the responsibility to provide for the special education services for their child, either within the public

school or through private means for the entire period of their child's eligibility." Ex. 35 p.121:5-18.

73. When asked if his assertion of "responsibility" was mandatory or optional, Dr. Watson would not clarify its meaning. Ex. 35 p.121:20-p.124:6.

74. When asked "you are not able to tell me today if its optional or mandatory" Dr. Watson testified "That would be true." Ex.35 p.124:14-16.

75. Special Educations services to the exceptional child under the student's IEP should assist the child to make progress in the general education curriculum regardless of where the services are provided. Ex. 35 p.152:13-16

76. General education curriculums that are in sectarian or religious private schools are different than what exist in a similar general education curriculum in the public school. Ex. 35 p.144:17-23.

77. An exceptional child's IEP is supposed to help the student make progress in their general education curriculum. Ex. 35 p.143:21-24.

78. All schools have different general education curriculums. Ex. 35 p. 143:25-p.144:2.

79. Whether a child is enrolled in a private or a public school the IEP should help that child make progress in that particular general education curriculum.  Ex. 35 p.144:3-15.

80.  One of the reasons why parents choose private schools so they can have religious kinds of instructions integrated in the general education curriculum. Ex. 35 p.144:24-p.145:5.

81. A private sectarian school has a general education curriculum which a parent can go to the school IEP team and ask for an IEP to make progress in that school's curriculum. Ex. 35 p. 152:22-p.153:7.

82. The IEP team is supposed to try and develop and IEP so that the exceptional child can make progress in the general education curriculum of the private sectarian school. Ex.35 p.153:4-7.

83. The Kansas Department of Education has no guidelines to identify when a religious activity occurs or what a "religious manner" is. Ex. 35 p.146:11-p.151:24.

### THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT | ARTICLE 40 SPECIAL EDUCATION REGULATIONS

84. The Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq*. was enacted in 1990 and offers federal funding to States to assist in educating children with disabilities. 20 U.S.C. §§ 1400; K.A.R. 91-40-44: 91-40-48.

85. The stated purpose of IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education" and "to assist States, localities, educational service agencies, and Federal agencies to provide for the education of all children with disabilities." 20 U.S.C. §§ 1400(d)(1)(A),(C).

86. In exchange for federal funding, a State must comply with a number of statutory conditions, including the requirement to provide a FAPE to all eligible "children with disabilities residing in the State between the ages of 3 and 21, inclusive." 20 U.S.C. § 1412(a)(1)(A); K.A.R. 91-40-7; 91-40-1.

87. The FAPE must be "provided in conformity with the [student's] individualized education program." U.S.C. § 1401(9)(D); K.A.R. 91-40-2; 91-40-3.

88. Individualized education programs are typically called IEPs. K.A.R. 91-40-17; 91-40-18.

89. A student's IEP is "a written statement for each child with a disability" that covers, inter alia, a "child's present levels of academic achievement and functional performance," "a statement of measurable annual goals, including academic and functional goals," and "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child." 20 U.S.C. § 1414(d); K.A.R. 91-40-2; 91-40-17.

90. A student's IEP is prepared with input by teachers, school officials, and a student's parents. IDEA also permits children to receive funding in private schools under certain circumstances. K.A.R. 91-40-17; 91-40-18.

91. Specifically, the statute provides that: Children with disabilities in private schools and facilities are provided special education and related services, in accordance with an individualized education program, at no cost to their parents, if such children are placed in, or referred to, such schools or facilities by the State or appropriate local educational agency as the means of carrying out the [statute's] requirements.  20 U.S.C. § 1412(a)(10)(B)(i); K.A.R. 91-40-43; 91-40-22; 91-40-1 ("no cost to the parent").

92. The "special education" provided under IDEA "means specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including- (A) instruction conducted in the classroom, in the home, in hospitals and

14

institutions, and in other settings; and (B) instruction in physical education." 20 U.S.C. § 1401(29); see also 34 C.F.R. 300.39(a) (defining "special education"); K.A.R. 91-40-1 ("specially designed instruction to meet the unique needs of exceptional children").

93. The "related services" provided under IDEA: Means transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children. 20 U.S.C. § 1401(26)(A); 34 C.F.R. 300.34(a) (defining "related services"); K.A.R. 91-40-1 ("'Related services'" means developmental, corrective, and supportive services that are required to assist an exceptional child to benefit from special education").

94. There are "other educational needs" besides that presented in a general education program. *See* 20 U.S.C.§ 1414(d)(1)(A)(i)(II)(bb) (requiring that a disabled student's IEP academic and functional goals must, "meet each of the child's *other* educational needs that result from the child's disability").

95. Every IEP must contain annual goals which are "enable the child to be involved in and make progress in the general education curriculum." 34 C.F.R. § 300.320(a)(2)(i); 34 C.F.R. § 300.320(a)(4)(i)-(ii) (IEP must include a statement [of services] "that are designed to enable the child to advance appropriately toward attaining the annual goals and to be involved in and make progress in the general education curriculum"); K.S.A. 72-3429(c)(2) ("make progress in the general education or advanced curriculum").

96. There is a requirement that exceptional children be placed in the least restrictive environment (LRE). K.A.R. 91-40-1.("children with disabilities … are educated with children who are not disabled"); 20 U.S.C. §1412(a)(5)(A). The statute states:

> To the maximum extent appropriate, children with disabilities are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

### STANDARD

The Court is familiar with the summary judgment standard. These plaintiffs bear the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. Once these plaintiffs meet their burden, the defendant Kansas Board of Education has the burden to demonstrate that genuine issues remain for trial. Summary judgment is proper when: (1) there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law; (2) material facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits; (3)  the Court views all evidence, and

draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Werner v. McGonigale*, No. 22-cv-02329, 2024 WL 216836 at *1 (D. Kan. January 19, 2024.

## ARGUMENT

### PLAINTIFFS' COMPLAINT

These plaintiffs bring declaratory and injunctive relief claims in their Amended Complaint (ECF 13) under 42 U.S.C. § 1983 against Randall Watson, in his official capacity for the Kansas State Board of Education. The Amended Complaint asserts 1983 claims as to the denial of government benefits under the First Amendment and Equal Protection Clause, Free Speech, Discrimination Against Religion, Unconstitutional Conditions, and a Parent's Right to Religiously Educate Her Son.

### S.B.'S GENERAL EDUCATION CURRICULUM

S.B. is entitled to an IEP to help him make progress in his parent's chosen general educational curriculum. Under Kansas school choice, that curriculum can be religious in any degree. The state of Kansas discriminates against religion by not only not permitting an IEP to be developed to make progress in that secular curriculum, Kansas will not permit the delivery of any special needs or related services in connection with anything Kansas considers to be a "religious activity." If it does not offend the Establishment Clause of the Constitution to have an interpreter sign words of the Catholic Priest at a Catholic Mass during the student's Catholic

educational curriculum which included Mass,[1] K.S.A. 72-3463's fear of establishing religion is not only erroneous but offends the Constitution by targeting religion for disparate treatment.  The Kansas Board of Education's regulation 91-40-48 similarly targets the religious exercise of Terri and her Heritage House school.  This misplaced interest in separating church and state is not only not compelling, it is not reasonable. As "explained in both *Trinity Lutheran* and *Espinoza*, such an interest in separating church and state more fiercely than the Federal Constitution cannot qualify as compelling in the face of the infringement of free exercise." *Carson v. Makin*, 142 S. Ct. 1987, 1998 (2022).

OVERVIEW OF KANSAS SCHOOL FRAMEWORK

Kansas provides school choice but not equally.  Kansas has statutorily recognized two categories of schools: public and private.  Concerning private schools, the Kansas legislature divided those private schools into "accredited" and "non-accredited."  But KSDE then did something to modify the statutory framework – it created a fiction class within the statutory non-accredited private school category KSDE labeled "homeschools."  In fact. Dr. Watson goes so far as to base this classification by its architecture – "brick and mortar" or whether it operates at all in a residence.  But what KSDE deems "homeschools" based on architecture in reality these private schools operate in many ways; as cooperatives meeting in churches, community buildings, and even other private schools. So with this school choice comes

---

[1] *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 3,13-14 (1993) (permitting a local school district to provide a publicly employed interpreter for a deaf student who attended a Roman Catholic high school).

disadvantages to the student classified as an exceptional child. The Kansas legislature now recognizes a fourth category of private schools it calls "private, denominational or parochial school" under Senate Sub. for HB 2567.[2]

While parents can freely choose private religious schools at their own expense for her general education student with no limitations.  But if the parent of the exceptional child does so it comes with a big disadvantage.  And though S.B.'s IEP is supposed to be designed to assist S.B. in his parent's chosen private general educational curriculum he loses that under K.A.R. 91-40-48. Instead, Kansas says forget about that private general education curriculum you the parent chose – S.B. must return to a public school desk where none of his private religious school benefits function.  Parents substantively lose the private school choice as Kansas demands that the exceptional child student S.B. be forced to come back to a public school desk and become a public school student subjected to the secular environment in order to receive any special needs services.

Although the federal scheme unequivocally states the exceptional child should receive his services in the "Least Restrictive Environment" – meaning "push in"

_____

[2] Section 14 on page 20 of HB 2567 it contains this language: ("(A) Is also enrolled in a nonaccredited private elementary or secondary school pursuant to K.S.A. 72-4345, and amendments thereto, or in any other private, denominational or parochial school pursuant to the provisions of subsection (a)."  If the three kinds of schools: "private," "denominational," or "parochial" schools were already "nonaccredited private elementary or secondary school" the "or" and the inclusion of these schools would be entirely superfluous.  HB 2567 again refers to the three schools on page 18. One thing is for sure is that "denominational" and "parochial" characterize the school as providing for all of the religious activities that  K.S.A. 72-3463 disqualifies for special needs service benefits.

services rather than "pull-out" services – that requirement is jettisoned in Kansas. All exceptional children in private schools must be pulled out, according to KSDE, and placed in its secular school environment to receive special needs services. Schools are not permitted by KSDE to push-in special needs services in the religious private school because Kansas had a belief it would establish religion if it did so. So it codified this erroneous belief in its anti-religion statute K.S.A. 72-3463. KSDE followed suit with its enabling regulation K.A.R. 91-40-48.

And then there is the special education statutory school structure for exceptional children. Unlike general population students, the only private school that qualifies for the exceptional child is a federally tax exempt organization. *See* K.S.A. 72-3461(c).[3]

### KSDE HAS NOT REQUESTED THE ATTORNEY GENERAL TO INTERVENE TO DEFEND THE CONSTITUTIONALITY OF THE STATUTE OR KSDE REGULATIONS OR STATUTES

The Commissioner of Education is the executive officer for the State Board of Education. Dr. Watson was sued in his official capacity. The Commissioner implements and enforces education law. The "proper vehicle for challenging the constitutionality of a statute, where only prospective, non-monetary relief is sought, is an action against the state officials responsible for enforcement of that statute." *Petrella v. Brownback*, 697 F.3d 1285, 1294 (10th Cir. 2012).

---

[3] "Private, nonprofit elementary or secondary school" means an organization which regularly offers education at the elementary or secondary level, which is exempt from federal income taxation under section 501 of the federal internal revenue code of 1954, as amended, which conforms to the civil rights act of 1964, and attendance at which satisfies any compulsory school attendance laws of this state.

KSDE could, but hasn't, request the Attorney General to intervene to defend. The state of Kansas is an interested party in this matter. *See* K.S.A. 75-702. The reason is the A.G. will not defend the Constitutionality of K.S.A. 72-3463 or K.A.R. 91-40-48.

### THE BOARD OF EDUCATION AND DR. WATSON'S KANSAS DEPARTMENT OF EDUCATION ARE FULLY RESPONSIBLE FOR THE CAUSE AND EFFECT UPON SCHOOL DISTRICTS SUCH AS BLUE VALLEY THROUGH IS REGULATIONS

Defendant Watson is an agent for the Kansas Board of Education. He is their appointed executive officer. An official capacity suit is "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). An "official capacity suit the entity's policy or custom must have played a part in the violation of federal law." *Id.* at 166. If the Court took the time to read Dr. Watson's deposition, he attempts to take a "not-my-problem-not-my-responsibility" tactic. The motion to dismiss makes no substantive arguments. This summary judgment motion will be the Kansas Board of Education's line-in-the-sand moment. But "it is not the task of this court to make a party's argument for her." *United States v. Allen*, 603 F.3d 1202, 1209 (10th Cir. 2010). Defendant Watson has not even opposed the injunctive relief motion. Defendant Watson has made no argument on the substance of any of the plaintiffs' First Amendment claims.[4] Watson has effectively stipulated to the plaintiffs' characterization of the law for purposes of

---

[4] Arguments on the merits of an injunction motion are forfeited or waived if not made with sufficient clarity or thoroughness. *See Fish v. Kobach*, 840 F.3d 710, 729-30 (10th Cir. 2016) (finding argument on merits of injunction motion "effectively waived" due to failure to raise it in district court briefing on injunction motion); *see also Verlo v. Martinez*, 820 F.3d 1113, 1131-332 (10th Cir. 2016) (upholding district court's entry of injunction that was based in part on defendant's failure to raise merits argument).

the preliminary injunction motion for "merits" issues other than ripeness and mootness. *See Verlo,* 820 F.3d at 1130-31, 1137 (finding that defendant "acquiesced in the district court's acceptance" of plaintiff's characterization of a legal issue and that "under that assumption, we can easily conclude the district court did not abuse its discretion in finding Plaintiffs were likely to succeed on their claim" for purposes of preliminary injunction).

Dr. Watson, in his official capacity, is the Kansas Department of Education. Yet KSDE claims ignorance in his discovery responses and his deposition as to the meaning of the very regulation it enacted in K.A.R. 91-40-48 – and for obvious reasons. KSDE feigns ignorance as to the meaning of the "responsibility" it declares parents of exceptional children have regarding providing special needs services "privately." These are preposterous positions. But KSDE's silence is deafening.

K.S.A. 72-3411 squarely puts the Commissioner's Board of Education and KSDE under bullseye of implementation and enforcement of KSDE's regulations upon schools in providing special needs services.[5] There is no better defendant than Commissioner Watson, in his official capacity as the executive officer of the Board of Education to obtain declaratory and injunctive relief.

### PLAINTIFFS HAVE STANDING

"The doctrine of standing gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial

---

[5] "(b) Special education and related services which are provided for exceptional children shall meet standards and criteria set by the state board and shall be subject to approval by the state board."

process." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014). To establish standing, a plaintiff must show (1) an injury in fact, (2) a causal connection between the injury and the alleged conduct, and (3) redressability. Id. An "injury in fact" must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* For First Amendment claims, "two types of injuries may confer Article III standing to seek prospective relief," even if a plaintiff has "never been prosecuted or actively threatened with prosecution." *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003); *Colorado Union of Taxpayers, Inc. v. Griswold*, No. 22-1122, 2023 WL 5426581, at *1 (10th Cir. Aug. 23, 2023).

The first type of injury requires only that a plaintiff intends to "engage in conduct that would … arguably violate the law" and that such conduct would "give rise to a credible fear of an enforcement action." *Griswold*, 2023 WL 5426581, at *1. The second type of injury occurs where a plaintiff is "chilled" from doing constitutionally protected conduct, typically speech. Under the latter theory, the plaintiff must provide (1) evidence that in the past they engaged in the type of speech or conduct affected by the challenged government action, (2) evidence that the plaintiff has a present desire, though no specific plans, to engage in such speech or conduct; and (3) a plausible claim that the plaintiff has no intention to engage in such speech or conduct because of a credible threat that the law will be enforced. *Peck v. McCann,* 43 F.4th 1116, 1129-31 (10th Cir. 2022). Under either of these two standing theories, the third "credible threat" prong of this test is the same and includes a multi-factor analysis. *Griswold*, 2023 WL 5426581, at *3, n.4 ("We have never interpreted

a 'credible fear' differently based on the plaintiff's theory of standing"). The credible-threat prong "is not supposed to be a difficult bar for plaintiffs to clear in the First Amendment pre-enforcement context." *Peck*, 43 F.4th at 1132.1 And the "threat of prosecution is generally credible where a challenged provision on its face proscribes the conduct in which a plaintiff wishes to engage, and the state has not disavowed any intention of invoking the provision against the plaintiff." *United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 901 (10th Cir. 2016)

As set forth in this briefing, S.B., Terri, and Heritage House are captured in the Kansas Special Education framework.  S.B. will have an IEP until an IEP Team dissolves it.  It means Terri is under an ongoing duty to provide special needs services in the manner dictated by the state of Kansas – all of which she is currently violating by not providing the services – and in educating S.B. in a private school which does all of the things K.S.A. 72-3463 prohibits. Terri is not sending S.B. to a public school to receive special needs services because the school system is "godless" – it violates her religious practices.  What is left?  The same fate happens in the private school arena because Kansas requires those private schools to also be "godless."

Terri and Heritage House are actually and "arguably" violating everything 72-3463 and K.A.R. 91-40-48 prohibits if S.B. is to receive any special needs services. *Griswold*, 2023 WL 5426581, at *1.  S.B. has been denied services.  Blue Valley says it will never provide special needs services to S.B. at Heritage House or during any religious activity.  Dr. Watson's KSDE does more than acquiesce – it repeatedly declares the anti-religion restrictions are alive and well.  Has there been past

24

enforcement against the same conduct?  Yes. Has the enforcement agency disavowed enforcement?  No. *See Peck*, 43 F. 4th at 1132. These plaintiffs have "an objectively justified fear of real consequences." *Id.*

### TERRI, S.B. AND HERITAGE HOUSE ARE ALL INDIVIDUALLY INJURED
### S.B. IS ENTITLED TO SPECIAL NEEDS AND RELATED SERVICES

Beginning with S.B., since he has an IEP S.B. is entitled to receive the special needs and related services.  That has not happened in a long time.  More than that, S.B., as an exceptional child, is captured in the Kansas educational system.  And according to the regulatory and statutory framework, those services must be delivered to him by qualified teachers and qualified professionals.  S.B. is injured because he has not received those benefits and in the manner required.  S.B. is also injured because the regulatory and statutory framework targets S.B. and his religious curriculum for disfavored treatment. KSDE has oversight authority over school districts who refuse to enroll exceptional needs students. KSDE has oversight authority over school districts to ensure they provide the special needs and related services to an exceptional child in their school district.  But KSDE turns a blind eye to Blue Valley's willful refusal to enroll S.B.

The defendant Kansas Board of Education Kansas will not allow special needs and related services to be available or provided at Heritage House during S,B,'s curriculum because there is a connection to religious courses, devotional exercises, religious training, or any religious activity.  This denies S.B. access to those benefits because of religion. Nonsectarian general education curriculums are the only curricula qualified to receive those special needs benefits.  It is thus impossible for

S.B. to obtain the core benefit of school choice because of connections to religious activities.

And under the Kansas framework, it says that S.B.'s parents must provide the special needs services privately which has not occurred.  Terri is not qualified to provide the services designated on S.B.'s IEP in the manner required under KSDE regulations. Under the regulation and statutory framework, Terri cannot provide S.B. any special needs services in the Heritage House school because it teaches ideology and is operated in a nonsecular environment – all of which is controlled by K.A.R. 91-40-48 and K.S.A. 72-3463.

### TERRI MUST PROVIDE SPECIAL NEEDS AND RELATED SERVICES TO S.B. IN THE MANNER REQUIRED BY KSDE REGULATIONS

Terri is similarly captured in the Kansas educational system.  Only the LEA "team" can change or eliminate that child's IEP.  K.S.A. 72-3404(r).  In that regard, the exceptional child is never released from the Kansas public school system as other school aged children are. Irrespective of whether Terri can afford to pay for special education and related services themselves, Kansas forces her to do so under the requirements and restrictions of the Kansas Education Code.  She must choose between the general education curriculum in a public or nonsectarian school with its FAPE benefits or instead exercise the parental rights of school choice and giving S.B. a Christian education in the manner of her religious general education curriculum without FAPE.  K.S.A. 72-3421 requires more than school attendance for the parent of the exceptional child: it requires a particular kind of school providing a specific curriculum: "shall be the duty … to require such child to attend school to receive the

26

special education and related services which are indicated on the child's IEP." Terri is given a skewed school choice but cannot parent S.B. in the manner she desires because of the Kansas framework Terri is captured in. Since the point S.B. had an IEP created by the Blue Valley School District, Kansas law has continuously required Terri to do one of two things with S.B.: enroll S.B. in public school to receive FAPE or if not that then provide those services herself, in the manner prescribed by KSDE regulations, out of her own pocket.

**HERITAGE HOUSE IS INJURED**

Heritage House meets the  HB 2567 definition of an "other private, denominational or parochial school," the K.S.A. 72-4345 definition of a nonaccredited private elementary school, as well as the special needs student school requirement set forth in K.S.A. 72-3461. Heritage House meets Dr. Watson's "homeschool" category. Under any categorization of "school" Heritage House is disqualified from being a school where special needs and related services can be delivered to its student S.B. because it operates in an ideological and sectarian manner.  Its student S.B. cannot make any progress in Heritage House's general education curriculum because the curriculum is "in connection with" all of the categories K.S.A. 72-3463 prohibits: "religious courses," "devotional exercises," "religious training," or "any other religious activity."  All private schools recognized by the Kansas Department of Education are legal entities. Under K.S.A. 72-4345, a Kansas nonaccredited private school is an organization organized and operating under the laws of Kansas. The statute defines "Private elementary or secondary school" to mean "an organization which regularly

27

offers education at the elementary or secondary level and attendance at which satisfies the compulsory school attendance laws of this state, but which is not accredited by the state board of education."

### FIRST AMENDMENT VIOLATIONS

Nothing in the Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 or the U.S. Constitution require that special education services be provided in a "secular and nonideological manner" (K.A.R. 91-40-48(c)(2)) or that they cannot be provided "in connection with religious courses, devotional exercises, religious training, or any other religious activity." K.S.A. 72-3463.  In conjunction with that religious targeting, nothing in the IDEA requires Kansas to impose a singular duty upon a parent of an exceptional child "to require such child to attend school to receive the special education and related services which are indicated on the child's IEP or to provide for such services privately." K.S.A. 72-3421. If the child does not attend school or the special services are not provided, the parents and students are subject to Kansas Child in Need of Care proceedings and criminal sanctions for truancy.  K.S.A. 72-1113; Kansas Attorney General Opinion 2000-16. Together with the compulsory exceptional children school attendance requirements, the entirety of the statutory and regulatory framework levy the consumption of several anti-religious and anti-speech poison pills corrupting the sum of this scheme in violation of the First Amendment.

#### FRAMEWORK VIOLATES THE FREE EXERCISE CLAUSE BY TARGETING RELIGION

K.A.R. 91-40-48 is facially offensive to the Constitution.  K.S.A. 72-3463 is facially offensive.  Putting that aside, in *Lukumi*, the Supreme Court struck down a

set of city ordinances that were neutral on their face but had the "impermissible object" of singling out the disfavored religious practice of animal sacrifice. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 524, 534 (1993) (holding that the "ordinances may be treated as a group for neutrality purposes"). *Id.* at 540. *Lukumi* analyzed their practical impact because "the effect of a law in its real operation is strong evidence of its object." *Id.* at 535. *Lukumi* concluded that the laws were not neutral, since in practice they acted as "religious gerrymanders." *Id.* at 534. Analyzed as a whole, so too here. None of the framework is accidental. Evidence of a law's lack of neutrality can come from its "historical background," the "series of events" spurring its enactment, and "contemporaneous statements" made by lawmakers. *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,* 138 S. Ct. 1719, 1731 (2018) (quoting *Lukumi,* 508 U.S. at 540). This framework is an offspring of the Blaine provision in Article 6, Section 6 of the Kansas Constitution. *See* Sondergard, M. (2018). BLAINES BEWARE: TRINITY LUTHERAN AND THE CHANGING LANDSCAPE OF STATE NO-FUNDING PROVISIONS. The University of Kansas law Review, 66(4), 753-785; *Wright v. School Dist. No. 27 of Woodson Cty.*, 99 P.2d 737, 738 (Kan. 1940).

### KANSAS' FRAMEWORK VIOLATES THE FREE EXERCISE CLAUSE BY IMPOSING THE SAME EXCLUSION FROM A PUBLIC BENEFITS PROGRAM INVALIDATED IN *CARSON*

Under the Free Exercise Clause, Kansas may not exclude private sectarian schools from its special needs benefits program because they are religious or do religious things. *Carson at* 1997-98. The Supreme Court has thrice held that a state "violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson,* at 1996; *see also Trinity Lutheran v.*

*Comer*, 582 U.S. 449 (2017); *Espinoza*, 140 S. Ct. at 2262. Moreover, "condition[ing] the availability of benefits" on a school's lack of religious character "'effectively penalizes the free exercise' of religion" and violates the First Amendment. *Carson*, at 1997-98.

Under K.A.R. 91-40-48(e) an "agency" can offer classes that are organized by the "religion of the student" yet cannot if the class could include both public and private school students.  That discriminates against special needs students because they must remain enrolled in the public school system in order for the parents to obtain FAPE even if sent to a private school.  K.A.R. 91-40-48(c)(2)) and K.S.A. 72-3463 are religious expression prohibitions.  Kansas continues to exclude religious private schools from the complete benefits of its special needs program today. The compulsory school requirements imposed upon each parent regarding their exceptional needs child, together with the parallel duty to ensure the special needs services must be provided in the manner dictated by K.A.R. 91-40-48(c)(2)) and K.S.A. 72-3463, these provisions work in tandem to prevent religious parents and schools from maintaining their respective religious identity if they want to qualify to receive FAPE.  In fact, it forces parents to altogether forfeit their religious identities when providing the services at their own expenses because of the ongoing unconstitutional conditions imposed upon the delivery of those services Religious institutions like Heritage House and Baumgarten Academy are therefore excluded unless and until they forfeit their religious character. By enacting these two provisions, Kansas has

effectively enacted the same comprehensive exclusionary scheme that the Supreme Court struck down in *Carson*.

The teacher control and the religious sterilizing conditions of K.A.R. 91-40-48 and K.S.A. 72-3463 make the receipt of free special education benefits – as well as the delivery of those services at the parent's own expense – conditional on the abandonment of religious identity, effectively disqualifying both parents and these homeschools "solely because they are religious." *Espinoza*, 140 S. Ct. at 2261. "That is discrimination against religion." *Carson*, 142 S. Ct. at 1998.

### KANSAS' REGULATORY AND STATUTORY FRAMEWORK VIOLATE THE FREE EXERCISE CLAUSE BECAUSE THEY ARE NOT GENERALLY APPLICABLE

A law is not generally applicable if it treats "any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021); see also *Fulton*, 141 S. Ct. at 1877 ("A law … lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way"). Special needs services are designed to be utilized in the general education curriculum." 34 C.F.R. § 300.320(a)(2)(i). Public and nonsectarian schools obtain the full benefits. However, sectarian schools which have a different general education curriculum including all of the things K.S.A. 72-3463 prohibits do not. Thus religious parents and sectarian schools are not able to obtain those benefits during – actually "in connection with" – that general education curriculum. Kansas' rules are a religious gerrymander with categorical exclusions of: (1) a  free special needs services in a sectarian general educational curriculum; and (2) providing those special needs services "privately" at

the parent's expense at any private school.  This renders those rules "underinclusive" because "[t]hey fail to prohibit nonreligious conduct that endangers [the State's nondiscrimination] interests in a similar or greater degree than" religious schools purportedly do. *Lukumi*, 508 U.S. at 543.  Kansas must therefore meet strict scrutiny, *Tandon*, 141 S. Ct. at 1296, which it cannot.

### KANSAS' FRAMEWORK VIOLATES THE FREE EXERCISE CLAUSE BY INFRINGING ON THE RIGHTS OF PARENTS TO DIRECT THE RELIGIOUS EDUCATION OF THEIR CHILDREN

Kansas' framework also impinge on "the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). "[T]he traditional interest of parents with respect to the religious upbringing of their children" is a "fundamental right[] and interest[]" and is "specifically protected by the Free Exercise Clause of the First Amendment." *Id.* at 214. It is also "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  Incursions on this fundamental right trigger strict scrutiny. *Yoder*, 406 U.S. at 214; *Employment Division v. Smith*, 494 U.S. 872, 881 (1990) (citing *Yoder*, 406 U.S. 205).

Terri, like many other religious parents, strive to raise their children according to their shared Christian faith.  But Kansas' regulations and statutes have interfered and continue to interfere with their ability and right to do so.  Were it not for Kansas' religious activity exclusions, they could have received FAPE or obtained special needs services at a private sectarian school while preserving their religious identity. Heritage House – or any sectarian private school Terri chose – could have received

the benefits of the preferred "push-in" services" described in the Amended Complaint. Doc. 13, ¶¶86-90. K.A.R. 91-40-48 specifically controls who and how special education services are provided. It constrains services to be provided outside the public school context in a "secular and nonideological manner" along with these additional restrictions at (b)(1)-(2):

> (1) The employee performs the services outside of the employee's regular hours of duty.
> (2) The employee performs the services under public supervision and control.

As a group of regulations, these provisions eviscerate parental control and school choice. Even though Kansas provides for school choice allowing some parents to educate their child with their own chosen teachers, these provisions do not permit this which subjects the plaintiffs disparate and unequal treatment. These provisions do not allow a parent to control the education or to educate her own exceptional child as other homeschoolers. As to other private sectarian schools, the parent may not receive the benefit of her chosen religious teacher – in fact the parent is not permitted to provide any of the special needs services herself. Instead, she must use a teacher controlled by the government. And then under the vague provision that the services be provided "outside regular hours." Thus this regulation specifically prohibits the push in delivery of special needs services during any general educational curriculum whether religiously sterile or not. By conditioning the use of otherwise generally available funding for religious schools on those parents and schools abandoning core elements of what makes them religious in the first place, Kansas has interfered with

Terri Baker's right to direct the religious upbringing of her child. *Yoder*, 406 U.S. at 235.

### KANSAS' FRAMEWORK VIOLATES THE FREE SPEECH CLAUSE BECAUSE IT COMPELS SPEECH BY PARENTS AND RELIGIOUS SCHOOLS

K.S.A. 72-3463, K.A.R. 91-40-48(c)(2), and together with K.S.A. 72-3421's private duty imposition upon each parent, independently violates Plaintiffs' rights under the Free Speech Clause by forcing them to allow speech that they disagree with during their sectarian general education curriculum. It requires plaintiffs to endorse a secular ideology. These religious expression provisions ban speech, and then distorts speech to require the plaintiffs to express viewpoints with which they do not agree. *Cressman v. Thompson*, 798 F.3d 938, 950 (10th Cir. 2015). But Kansas cannot "compel [a] speaker to alter [its] message by including one more acceptable to others." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston,* 515 U.S. 557, 581 (1995); *see also W. Va. Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943).

In *Hurley*, the Supreme Court unanimously held that the First Amendment protected the right of a private parade organizer to exclude a group from participating in the parade because of the message that the group sought to convey. *Hurley* at 570, 574. "Since every participating unit affects the message conveyed by the private organizers," forcing the parade organizers to include an unwanted unit would "alter the expressive content of their parade." *Id.* at 572-73. The Court held that this would violate "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* at 573.

Kansas' rules violate the parent's and the school's right to "choose the content of [its] own message." *Hurley*, 515 U.S. at 573.

### KANSAS' FRAMEWORK VIOLATES THE FREE SPEECH CLAUSE RIGHT OF EXPRESSIVE ASSOCIATION

The religious activity and expression provision also interferes with the Plaintiffs' expressive association rights.  Parents must associate themselves at all times with a government controlled employee to teach their child. As to messaging, the First Amendment protects the rights of individuals, as well as institutions, to "associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, … and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984).  "Religious groups" like these parents and their homeschools "are the archetype of associations formed for expressive purposes." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,* 565 U.S. 171, 200 (2012) (Alito, J., joined by Kagan, J., concurring).  The First Amendment protects the right to direct the education of a child and by extension the right to associate with others of their choosing to accomplish that purpose. *See Yoder*, 406 U.S. at 232; *see also Mahanoy Area Sch. Dist. v. B.L.,* 141 S. Ct. 2038, 2053 (2021) (Alito, J., joined by Gorsuch, N., concurring) ("In our society, parents, not the State, have the primary authority and duty to raise, educate, and form the character of their children").

These homeschools were formed to partner with these plaintiff parents in educating their children according to their Christian faith. To accomplish that purpose, these homeschools must be free to express its particular Christian message during its general education curriculum without intervention by the state. But

Kansas is now conditioning the receipt of special needs services on the forfeiture of a school's ability to control the religious messages conveyed on its own campus by its own teachers.  In doing so, Kansas interferes with the ability of these homeschools and Kansas Christian families to join together to impart Christian teachings to the next generation utilizing their own teachers.  That intrusion violates the First Amendment.

### KANSAS' FRAMEWORK VIOLATES THE ESTABLISHMENT CLAUSE BECAUSE THEY INVITE EXCESSIVE ENTANGLEMENT UNDER *CARSON*

*Carson* also explained that "scrutinizing whether and how a religious school pursues its educational mission" would "raise serious concerns about state entanglement with religion and denominational favoritism," both of which violate the Establishment Clause. *Carson* at 2001 (citing *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020); *Larson v. Valente*, 456 U.S. 228, 244 (1982)).  But Kansas' collective rules mandating government controlled teachers and its religiously sterile requirements do just that: they reach into the heart of religious schools and give schools (empowered by the KSDE regulation) – not parents and the religious schools they partner with—the authority to say how the schools should be run.  To define what meets when a general educational curriculum is encompassed in the religious criteria of K.S.A. 72-3463 and K.A.R. 91-40-48(c)(2) is precisely that kind of prohibited entanglement. ECF 13, ¶27.  This scheme creates excessive entanglement between the state of Kansas and religious parents and schools—an entanglement that inevitably invites Kansas officials to condone the actions of religious schools who have beliefs the government agrees with and sanction those who do not. Further, it "is not only the conclusions that may be reached by the

[Commission] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB v. Catholic Bishop*, 440 U.S. 490, 502 (1979). As *Carson* recognized, this kind of government interference in the internal policies of religious organizations is anathema to our constitutional order. 142 S. Ct. at 2001.

### KANSAS' FRAMEWORK VIOLATES THE FIRST AMENDMENT RIGHT OF RELIGIOUS AUTONOMY

Kansas' rules violate the right of religious autonomy as well. Religious autonomy, which arises from the nexus of the Free Exercise and Establishment clauses, was what *Carson* had in mind when it reminded Maine that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* (citing *Our Lady*, at 2064, and *Hosanna-Tabor*, 565 U.S. at 192). The right to select who will carry out these important functions is at the heart of religious autonomy. For that reason, cases like *Hosanna-Tabor* and *Our Lady* have held that teachers at these homeschools and other private sectarian schools who are responsible for imparting the faith to the next generation are "ministers" whose employment is exempt from state and federal employment discrimination law. *Our Lady*, 140 S. Ct. at 2064. Likewise, religious schools have the constitutional right – long protected in Kansas and Federal employment law – to hire non-ministerial staff that support their religious mission in word and deed. *See, e.g., Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 329 (1987) (construing Section 702 of Title VII of the Civil Rights Act of 1964 to allow a church-owned gym to discharge a janitor for failing

to conform to the church's teachings in his personal life); *Bryce v. Episcopal Church*, 289 F.3d 648, 660 (10th Cir. 2002) (recognizing religious autonomy right to make "personnel decision[s] based on religious doctrine"). Kansas has made it clear that it does not defer to the religious autonomy of religious schools in its special needs program: it strips parents and religious private schools of their hiring rights and to enjoy a religious general educational curriculum which violate religious autonomy.

### KANSAS' FRAMEWORK IMPOSE UNCONSTITUTIONAL CONDITIONS ON THE PROGRAM

At a basic level, Kansas' regulatory efforts to control the internal operations of religious schools run headlong into the doctrine of unconstitutional conditions.[6]  A "State may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom … even if he has no entitlement to that benefit." *Mahanoy*, 141 S. Ct. at 2053-54 (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013)) (AOSI). Under this doctrine, the government may not "go[] beyond defining the limits of the [government] funded program to defining the recipient" by seeking to control the internal policies of the recipient itself. *AOSI,* 570 U.S. at 218.  Thus, in *AOSI*, the federal government could require grant recipients to use federal money to promote the government's anti-AIDS message and to oppose legalized prostitution – but it could not require grantees to adopt the government's policies opposing legalized prostitution as their own. *Id.* at 220-21.

Kansas' framework runs afoul of *AOSI*.  Kansas has decided to expand special needs services and provide school choice that parents may direct. Kansas' rules

---

[6] This is not new. In *Carson*, the First Circuit recognized that *Trinity Lutheran* and *Espinoza* "resonate[] with unconstitutional conditions doctrine in the First Amendment area more generally." *Carson*, 979 F.3d at 34 n.1.

coerces parents and religious schools to stop being religious. This it cannot do. Kansas' "administration of that benefit is subject to the [First Amendment] principles governing any such public benefit program" which means, among other things, that it "cannot disqualify some private schools solely because they are religious." *Carson*, 142 S. Ct. at 2000.

### KANSAS' CANNOT SATISFY STRICT SCRUTINY

Not all of Plaintiffs' claims require a strict scrutiny analysis.[7] But for those that do, Kansas' rules fail because they are not narrowly tailored to serve a compelling government interest. "A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. Kansas purports to assert a compelling interest in not establishing religion. But as "explained in both *Trinity Lutheran* and *Espinoza*, such an interest in separating church and state more fiercely than the Federal Constitution cannot qualify as compelling in the face of the infringement of free exercise." *Carson*, 142 S. Ct. at 1998.

### CONCLUSION

Kansas provides for school choice but has enacted regulations and statutory prohibitions directed to religion with the intention of avoiding an Establishment

---

[7] Where government targets religious exercise, attempts to interfere with church autonomy, or becomes entangled in religious affairs, a court must "'set aside' such policies without further inquiry" and without the need for a strict scrutiny analysis. *Kennedy v. Bremerton Sch. Dist.,* 142 S. Ct. 2407, 2422 n.1 (2022) (religious targeting); *see also Our Lady*, 140 S. Ct. at 2060 (church autonomy/entanglement).

Clause violation under the abrogated *Lemon* test. The secular special needs services remain secularly purposed and the discrimination against religion is not only not necessary but targets Terri's religious practices for disparate treatment. The framework obligates Terri to pay out of her own pocket special needs services because Kansas demands those services be delivered in a religiously sterile setting --  a condition that forces Terri to choose between adhering to her religious beliefs and risking criminal prosecution or exclusion from the services program or complying with the KSDE's regulation and Kansas statutes requiring this "godless" delivery of services. Kansas is excluding religious observers from receiving otherwise available educational benefits and funding because of Terri's and Heritage House's religious status or practice.  The Court should find grant summary judgment in favor of these plaintiffs and against the defendant Randall Watson, in his official capacity as executive for the Kansas Board of Education, find that K.A.R. 91-4048(c)(2), K.S.A. 72-3421, and K.S.A. 72-3463 are each unconstitutional as set forth in the arguments above.

The plaintiffs request oral argument on this motion pursuant to D. Kan. Rule 7.2.

/s/Linus L. Baker KS 18197
6732 West 185th Terrace
Stilwell, Kansas 66085
Telephone:    913.486.3913
Fax:              913.232.8734
Email: linusbaker@prodigy.net
Attorney for the plaintiffs

**CERTIFICATE OF SERVICE**

On this 31st day of May, 2024, the above document was filed with the Court's CM-ECF system which will provide notice to all counsel of record.
/s/Linus L. Baker
Linus L. Baker