UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Terri Baker *et al*

Plaintiffs,

v.

Randall Watson *et al*

Defendants

Case No. 5:23-cv-04022-TC-TJJ
Request for Oral Argument
D. Kan. Rule 7.2

**PLAINTIFF TERRI BAKER'S MEMORANDUM IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT AGAINST DEFENDANT BLUE VALLEY**

**KANSAS SCHOOL CHOICE**

1. S.B., Terri's son, has an educational need to learn about God and the Christian Gospel of Jesus Christ as the Messiah for all mankind. Ex. 7; Ex. 5, p.22:17-18; p.23:1-18; p.24:1-19; p.28:12-24; p.49:17-p.50:12.

2. Kansas provides parents of school-age children what is called "school choice" permitting parents to comply with Kansas' compulsory education statutes by allowing school aged children to be enrolled in accredited or nonaccredited private elementary or secondary schools. *See* Ex. 1 (Kansas Education Handbook) p. 117; K.S.A. 72-4345; Kansas House Bill No. 2567.

**SPECIAL EDUCATION STUDENTS DO NOT HAVE THE SAME SCHOOL CHOICE**

3. According to the Commissioner's KSDE Handbook, K.S.A. 72-3461(c) requires private schools for special education services to be an organization which regularly offers education at the elementary or secondary level, which is exempt from federal income taxation under section 501 of the federal internal revenue code....Accordingly, a home school may be a private school for special education purposes, but only if it meets the definition of a private school in K.S.A. 72-3461(c)." Ex. 1, p.117.

4. The Handbook also states that "because Kansas homeschools meet the definition in K.S.A. 72-4345 as a "Nonaccredited private school," they meet the requirement (A) in K.S.A. 72-3120(h). That means that if (A) a child is being educated in a Kansas homeschool, (B) the parents request part-time enrollment, AND (C) the child meets the age of eligibility to attend school, the school district of residence must accept the child on a part-time basis to attend any of its courses, programs or services, including special education services specified in a child's IEP. Ex. 1, p.117.

5. The Handbook states "it is the duty of the parent of a child with a disability (does not included gifted) to require their child to attend school to receive the special education and related services in the child's IEP or the parent must provide such services privately (K.S.A. 72-3421). This requirement is in addition to and goes beyond the standard Kansas compulsory attendance statute at K.S.A. 72-3120." Ex. 1, p.117.

6. The Kansas Department of Education, through its Commissioner Randall Watson, publishes a Kansas Educational Directory, the current being 2023-2024. Ex. 2.

7. On page 26 the Directory identifies Blue Valley USD 229 as being under the jurisdiction of the Kansas Board of Education. Ex. 2, p.26.

8. On page 424, the Directory identifies "Schools under the jurisdiction of the State Board of Education." Ex. 2, p.424.

9. Beginning on page 426, the Directory identifies "Private Accredited Educational Organizations and Schools" as being under the jurisdiction of the Kansas Board of Education. Ex. 2, p.426.

10. At page 447, the Directory identifies "Private Nonaccredited Elementary and Secondary Schools" as being under the jurisdiction of the Kansas Board of Education." Ex. 2, p.447.

11. The Office of Commissioner has ongoing jurisdiction over the exceptional child if the child is enrolled in a non-accredited private school. Ex. 10 p.54:19-23.

12. Although the Kansas Board of Education recognizes what it calls "homeschools" to be a school of the "Private Nonaccredited Elementary and Secondary School" kind, the Directory does not identify any "homeschool" in its Directory of Schools. Ex. 2.

13. The Kansas Board of Education has published a "Dyslexia Handbook" which it states the purpose is "to provide information and procedures to be used by school districts, administrators, specialists, teachers, higher education faculty, students and parents/guardians in early identification of, instruction for, and accommodations for students who struggle to read." Ex. 3, p.5.

14. The Dyslexia Handbook outlies a 3 Tier model for providing assistance to students even when they do not have a special needs IEP. Ex.3, pp.14. 16, 19-20, & 38-39.

15. The screening is "evidence-based interventions that address reading deficits, with or without an official diagnosis." Ex. 3, p.36.

### BLUE VALLEY IS AWARE S.B. NOT RECEIVING SPECIAL NEEDS AND RELATED SERVICES

16. Dr. Mark Schmidt is the Assistant Superintendent of Special Education for the Blue Valley School District. Ex. 9, p.6:21-25; p.9:7-23.

17. Dr. Schmidt stated that Terri was not qualified to provide related services to S.B. such as occupational therapist services. Ex.9, p.69:18-p.70:25.

3

18. S.B. has not received the special education and related services designated in his IEP of which Blue Valley is aware of this fact. Ex. 5, p.30:7-13;p.86:17-24; p.89:4-16; p.90:1-10.

19. The Handbook states that "if the school district is aware that an eligible child is not receiving needed special education and related services due to the parents' refusal to provide or accept the needed services, the school must determine if it is necessary to report the child as a child in need of care as a result of truancy to the Kansas Department of Children and Families (DCF), if the child is under age 13, and to the District or County Attorney if the child is between the ages of 13 and 18. When making this determination, school districts should examine whether the parent has exercised their right to refuse to give consent for initiation of services or to revoke consent for all services." Ex. 1, p.117.

20. Terri Baker has consented to the initiation of special needs services for S.B. and has never revoked consent for any of those services. Ex. 7, ¶¶6-7, 16; Ex. 5, p.30:7-13;p.86:17-24; p.89:4-16.

21. Blue Valley has un-enrolled S.B. without the knowledge or consent of S.B.'s parents. Ex. 9 p.181:25-p.182:9.

22. Terri has no experience with special education services. Ex. 5, p.21:19-24.

23. Terri is unable to teach S.B. special education at her home school. Ex. 5,p.89:1-17.

24. One of the reasons Terri has attempted to enroll S.B. in the Blue Valley school district is so that S.B. can obtain free services from Blue Valley. Ex. 5, p.127:21-p.128:1.

25. This attempt at S.B.'s enrollment in the Blue Valley school district was Terri's attempt to obtain S.B.s education and special services from Blue Valley for S.B. Ex. 5, p.128:4-8.

26. Terri has made numerous requests to the Blue Valley School District to enroll S.B. in the Blue Valley School District through the ParentVue parent website. Ex. 5 p.128:20-p.129:20.

27. Terri has successfully enrolled S.B. through ParentVue in the past. Ex. 5, p.128:20-p.129:20.

28. After Terri completed the ParentVue registration, Blue Valley did not contact Terri to explain why it would not enroll or re-enroll S.B.  Ex. 5, p.129:17-20.

### KANSAS DEPARTMENT OF EDUCATION

29. Randall D. Watson has been appointed by the Kansas State Board of Education as Commissioner of Education. Ex. 10, p.7:11-24;

30. Dr. Watson represents the State Board of Education and has general oversight of this agency and education functions that align with the Kansas constitution. Ex. 10 p.10:22-24; p.6:17-23.

31. Dr. Watson's office "has the ultimate responsibility for the entire agency and directly oversees those agency functions that provide services to the entire agency." Ex. 10, p.7:11-24.

32. Dr. Watson oversees the Division of Learning Services in which Dr. Ben Proctor serves as Deputy Commissioner which has oversight over Special Education and Title Services. Ex. 10, p.8:15-20.

33. Dr. Watson has enforcement and implementation obligations regarding the State Board of Education regulations as set out in the Kansas State Board of Education Policies which was marked as Exhibit 4 in Dr. Watson's deposition. Ex. 10 p.10:1-7; p.14:3-p.15:14.

34. Under K.A.R. 91-40-43, Dr. Watson's Office of Commissioner is required to implement and enforce this 91-40-43 which requires school boards to provide special needs services to exceptional children residing in the school board's district. K.A.R. 91-40-43.

35. K.S.A. 72-3463 states that "no special education services shall be provided in connection with religious courses, devotional exercises, religious training or any other religious activity." K.S.A. 72-3463.

36. Under K.A.R. 91-40-48, the Kansas Department of Education requires each agency to "ensure that special education and related services provided to exceptional children enrolled in private schools are provided in a secular and nonideological manner." Ex. 10 p.79:2-7; p.80:7-19

**BLUE VALLEY FOLLOWS THE COMMISSIONER'S HANDBOOK WITH HIS INTERPRETATIONS OF REGULATIONS AND STATUTES**

37. Dr. Schmidt testified that he was familiar with the Kansas regulations on special education as "mainly as interpreted through the process handbook." Ex. 9, p.48:1-5; p.65:24-p.66:10.

38. Blue Valley enforces Chapter 14 of the Special Education Handbook of KSDE which contains the language "no special education services shall be provided in connection with religious courses, devotional exercises, religious training or any other religious activity." Ex. 9 p.216:23-p.218:2.

39. Chapter 14 of the Kansas State Department of Education Kansas Special Education Process Handbook states that "State law allows for services to be provided at either the public or private school, but forbids the provision of special education and related services 'in connection with religious courses, devotional exercises, religious training, or any other religious activity.'" Ex.1. p.225.

40. In order for Blue Valley to provide S.B. special needs services, it has to be on Blue Valley's terms. Ex. 5, p.134:14-23.

41. Blue Valley has provided special needs services to students at their home residence or at other buildings which are not Blue Valley buildings. Ex. 9, p.89:6-25.

42. Blue Valley will not provide special needs services in connection with any religious activities of the student even when providing them outside of Blue Valley buildings. Ex. 9, p.90:3-8.

43. Special needs services will not be provided to S.B. by Blue Valley during religious activities or his religious curriculum which is what Terri wants. Ex. 5, p.134:20-23; p.135:7-16.

44. Terri's son S.B. is diagnosed with dyslexia and Dysgraphia and has long had an Individualized Education Program (IEP) established for years. Ex. 5 p.35:21-p.39:15; 5 p.58:19-p.61:25.

45. Terri would accept special services provided by Blue Valley in S.B.'s religious curriculum. Ex. 5, p.135:7-16.

46. S.B. was evaluated and diagnosed with Dyslexia and Dysgraphia by the Jordan Psychological Assessment Center. Ex. 5 p.58:19-p.61:25.

47. S.B, who is ten years old, was evaluated on January 12 and 18, 2023, by Dr. Brooke Carson, a licensed Psychologist with the Jordan Psychological Assessment Center. Ex. 8.

48. Dr. Brooke was paid $3,040.00 to assess S.B.'s cognitive, academic, attention, social/ emotional, and/or behavioral functioning using standardized measures of the appropriate domains and using tests appropriate for the child's age and level of functioning. Ex. 8, p.4, p.35.

49. After her assessments, Dr. Carson provided a 34 page written report on February 22, 2023, which contained a specific learning disorder in reading (dyslexia) for S.B. and contained a diagnosis of Specific Learning Disorder with Impairment in Written Expression (Dysgraphia) for S.B. Ex. 8, p.26.

50. Dr. Brooks stated in her report that S.B. "would benefit from an Individualized Education Plan (IEP) to address his needs as a child with learning disabilities." Ex. 8, p.26.

### HOUSE BILL NO. 2567

51. Terri and her son "S.B." (an alias) reside at 6732 West 185th Terrace Stilwell Kansas which is in the Blue Valley school district. Ex. 5 p.6:5-10.

52. Pursuant to Senate Sub. for HB 2567, S.B. is currently enrolled part time in the Blue Valley school district for the 2024-2025 school year. Ex. 6 (ParentVue Webpage).

53. Under Senate Sub. for HB 2567 which took effect for the 2024-2025 Kansas school year, each board of education of a school district shall allow any child to enroll part-time in the school district to allow the student to attend any courses, programs or services offered by the school district if the child: (A) Is also enrolled in a nonaccredited private elementary or secondary school pursuant to K.S.A. 72-4345, and amendments thereto, or in any other private, denominational or parochial school pursuant to the provisions of subsection (a); (B) requests to enroll part-time in the school district; and (C) meets the age of eligibility requirements for school attendance pursuant to K.S.A. 72-3118, and amendments thereto. Ex. 4.p.20.

### TERRI'S EFFORTS TO COMPLY WITH THE PRIVATE DUTY STATUTE IN THE BLUE VALLEY SCHOOL DISTRICT

54. Terri enrolled S.B. in the Blue Valley School District to comply with the Commissioner's Handbook requirements that she has a duty to S.B. that he be provided FAPE and the special needs and related services designated on S.B.'s I.E.P. Ex. 7 (Sworn Statement of Terri Baker), ¶ 8.

55. S.B. must be enrolled in the Blue Valley School District to receive his Free Appropriate Public Education (FAPE) from Blue Valley.  Ex. 9 p. 31:1-6; p.139:13-23; p.182:10-23.

56.  The Blue Valley website links the Kansas Special Education Process Handbook. Ex. 9, p.10:14-22.

57. S.B. is entitled to receive special needs services from Blue Valley but in order for S.B. to receive those special needs services from Blue Valley, S.B. must first be enrolled in the Blue Valley school district. Ex. 9, p.40:22-p.41:17; p.43:7-15.

58. In order to even request FAPE from Blue Valley, S.B. had to first be enrolled with Blue Valley. Ex. 9, p.44:2-15.

59. In order for S.B. to attend Blue Valley classes, S.B. must first be enrolled with Blue Valley school district. Ex. 9, p.45:3-19.

60. Dr. Schmidt stated that related services in S.B.'s IEP would be the occupational therapy and speech language services. Ex. 9, p.47:13-25.

61. Blue Valley does provide special education and related services to exceptional children enrolled in private schools. Ex. 9, p.68:12-17.

62. Dr. Schmidt knows the Kansas Commissioner through his Handbook does not permit Blue Valley to provide S.B. services when they are connected to S.B.'s religious instruction. Ex. 9, p.51:2-5.

63. Even if S.B.'s special education teacher thought S.B. singing "Joy to the World the Lord has Come Let Earth Receive Her King" would help S.B. it would not be permitted by Blue Valley because it's a "religious song." Ex. 9, p.53:1-25.

64. Blue Valley will never provide push-in services for S.B. even when Blue Valley places S.B. in a private school placement. Ex. 9, p.56:2-23.

65. Blue Valley would not permit its special education teacher to initiate having S.B. in drawing "three kings on their way to see baby Jesus" even if the special needs teacher thought it would help S.B. learn. Ex. 9, p.57:4-15.

66. Dr. Schmidt said if S.B. initiated the drawing the special needs teacher could assist because it wasn't a "religious activity." Ex. 9, p.57:16-18.

67. Dr. Schmidt agreed that Blue Valley will not provide special education services in connection with religious activities but that determining whether an activity was religious was "outside my expertise" and that he doesn't know. Ex. 9, p.58:1-19.

68.  Blue Valley will not provide any push-in special needs services for S.B. in his non-accredited private school. Ex. 9 p.56:9-p.57:20; p.59:21; p.138:22-p.139:2.

69. Regarding the "nonideological manner" requirement, Dr. Schmidt admitted Blue Valley does teach ideologies but not of the religious kind. Ex. 9, p.66:11-p.68:2.

70. Blue Valley will not provide any special needs services to S.B. in S.B.'s non-secular general education curriculum because of K.A.R. 91-40-48 and K.S.A. 72-3463. Ex. 9 p.216:23-p.218:2; p.145:2-6.

71. When Blue Valley un-enrolled S.B. it changed S.B.'s access to his special education services. Ex. 9 p.165:4-21.

72. S.B.'s school district Blue Valley requires that S.B. must be enrolled
 and will not provide S.B. any special needs or related services
while S.B. is learning using these kinds of faith-based books. Ex. 9 p.215:20-p.216:21; p.56:9-p.57:20; p.59:11-p.63:17; p.138:22-p.139:2; p.216:23-p.218:2; p.145:2-6.

### TERRI'S FAITH-BASED BELIEFS

73. Terri is a Christian and has attended Bible School. Ex. 5 p.22:17-18: p.15:19-23.

74. Terri's religious faith affects her parenting of S.B. Ex. 5 p.23:16-p.26:9.

75. S.B. has attended Whitefield Christian Academy and Terri unsuccessfully attempted to later enroll S.B. in other Christian schools. Ex. 5 p.62:12-p.66:7.

76. Because S.B. had dyslexia it made it difficult to get S.B. enrolled in a private Christian school. Ex. 5 p.68:8-13.

77. When asked what was wrong with Blue Valley Terri said "the environment" and that it was "godless." Ex. 5 p.68:11-23.

78. Terri wanted S.B. to have push in special need services in S.B.'s private school general education curriculum. Ex. 5 p.78:9-13-25; p.92:24-p.93:24.

79. Terri's understanding is that S.B. needed to be enrolled at Blue Valley in order to get services or be tested but that Blue Valley would not enroll S.B. Ex. 5 p.81:13-p.82:14; p.86:17-21; p.90:6-10; Ex. 34 p.211:1-p.215:4; p.216:2-21.

80. Terri did not agree to the statement that "Blue Valley hasn't done anything to stop you from obtaining special education services at a school of your choosing." Ex. 5 p.90:1-5.

81. S.B. has been and continues to be enrolled in a registered non-accredited private school called Heritage House. Ex. 5 p.89:4-8; p.99:12-19; p.102:19-22.

82. Blue Valley enforces K.A.R. 91-40-48's requirement that "special education and related services provided to exceptional children enrolled in private schools are provided in a secular and nonideological manner." Ex. 5 p.134:14-p.135:18.

83. An exceptional child in the state of Kansas is always entitled to the services that are designated in the child's IEP when his parent has not withdrawn consent for the services. Ex. 10 p.171:15-24; p.174:10-p.175:7.

84. An exceptional student's IEP continues to exist irrespective of whether that child is enrolled in a public or private school. Ex. 10 p.141:1-5.

85. Kansas non-accredited private schools must follow the Board of Education's regulations set forth by law. Ex. 10, p.35:19-25.

86. In Kansas Department of Education Handbook, Chapter 1, it states that special education statutes "sets forth parental responsibilities. This law requires parents to see that their child with a disability (not giftedness) attends school so that their child can receive the special education and related services on the child's IEP, or to provide such services privately." Ex. 1, p.10; Ex. 10 p.100:22-p.101:15.

87. A parent may not revoke consent for the continued provision of a particular service or placement unless the child's IEP team certifies in writing that the child does not need a particular service or placement for which consent is being revoked in order to receive a free public education. Ex.1 p.22, 47, 145; Ex. 10 p.191:10-25.

88. Prior to Kansas House Bill No. 2567 being enacted, the Special Needs Handbook stated that "Public schools are also not required to permit part-time enrollment of home schooled children for purposes of receiving special education and related services." ECF 106-12.

89. The Special Needs Handbook stated that "public schools are not required to provide special education and related services for home-schooled children" even though Kansas now provides for dual or part-time enrollment. ECF 106-12; Ex. 10 p.114:17-p.117:9.

**IEP MUST BE DESIGNED TO MAKE PROGRESS IN THE CHILD'S GENERAL EDUCATION CURRICULUM**

90. S.B.'s IEP could assist S.B. in memorization utilizing music but Blue Valley will not develop an IEP using music of a Biblical Hymn or Biblical verse. Ex. 9, p.134:1-

13

24. Despite Kansas providing for school choice, Blue Valley states S.B. must be enrolled at Blue Valley and obtain an IEP only designed to make progress in Blue Valley's secular education curriculum. Ex. 9,p.122:1-12; p.123:7-19; p.125:9-17; p.126:8-12.

91. Blue Valley will not design S.B.'s IEP to meet his "other educational needs" if those educational needs involve religion. Ex. 9, p.132:10-15.

92. Special Educations services to the exceptional child under the student's IEP should assist the child to make progress in the general education curriculum regardless of where the services are provided. Ex. 10 p.152:13- p.153:7

93. General education curriculums that are in sectarian or religious private schools are different than what exist in a similar general education curriculum in the public school. Ex. 10 p.144:17-23.

94. An exceptional child's IEP is supposed to help the student make progress in his general education curriculum. Ex. 10 p.143:21-24.

95. All schools have different general education curriculums. Ex.10 p. 143:25-p.144:2.

96. Whether a child is enrolled in a private or a public school the IEP should help that child make progress in that particular general education curriculum.  Ex.10 p.144:3-15.

97.  One of the reasons why parents choose private schools so they can have religious kinds of instructions integrated in the general education curriculum. Ex. 10 p.144:24-p.145:5.

98. A private sectarian school has a general education curriculum which a parent can go to the school IEP team and ask for an IEP to make progress in that school's curriculum. Ex. 10 p. 152:22-p.153:7.

99. The IEP team is supposed to try and develop an IEP so that the exceptional child can make progress in the general education curriculum of the private sectarian school. Ex.10 p.153:4-7.

100. Blue Valley can re-evaluate S.B.'s IEP without parental consent if it has made a reasonable effort. Ex. 1, p.16 (citing K.A.R.91-40-27).

101. Dr. Schmidt interprets the Handbook as obviating Blue Valley's obligation to re-evaluate S.B. at all. Ex. 9,p.153:4-p.154:4; p.155:6-p.156:4.

102. Every IEP must contain annual goals which are to "enable the child to be involved in and make progress in the general education curriculum." 34 C.F.R. § 300.320(a)(2)(i); 34 C.F.R. § 300.320(a)(4)(i)-(ii) (IEP must include a statement [of services] "that are designed to enable the child to advance appropriately toward attaining the annual goals and to be involved in and make progress in the general education curriculum"); K.S.A. 72-3429(c)(2) ("make progress in the general education or advanced curriculum").

I declare under penalty of perjury that the foregoing facts about me and my son are true and correct.
Executed on November 15, 2024

Terri E. Baker

**STANDARD**

The Court is familiar with the summary judgment standard. The Court views all evidence, and draws all reasonable inferences, in the light most favorable to the

nonmoving party. *See Werner v. McGonigale*, No. 22-cv-02329, 2024 WL 216836 at *1 (D. Kan. January 19, 2024.

**ARGUMENT**

**TERRI AND S.B. ARE CAPTIVE TO THE STATUTORY REQUIREMENTS**

Terri and S.B. are captive to the Kansas statutory requirements now and for the next eight years. Terri has been and is now under a statutory obligation to provide Special Education services to S.B. that are designated in S.B.'s IEP. That obligation is a profound burden to Terri's First Amendment rights and an injury coupled with the Blue Valley's conditions for free Special Education services to S.B. Blue Valley requires that either Terri accept delivery of S.B.'s Special Education services on Blue Valley terms or that Terri take on the substantial financial obligation of those educational services if she is to remain true to her religious beliefs. S.B. is enrolled part time in the Blue Valley school district but he has not – and is not –receiving all of the Special Education and related services that are specified in his IEP.

A law that on its face categorically excludes a group of people from a public benefit because of who they are religiously is the textbook definition of an injury in fact for standing purposes. Blue Valley will not dispute that it excludes Jewish, Muslim, and Christian children and their schools from Blue Valley's generally available public benefits program because a parent is or acts religious. In fact, Blue Valley thinks its facially anti-religion discriminatory rule it enforces from the Kansas Commissioner's Handbook is just fine. Blue Valley says Plaintiff has suffered no

injury and that its religious exclusion does not fall afoul of the Free Exercise Clause or the Equal Protection Clause. In Blue Valley's view, parents of exceptional children exercising religious school choice need not apply for Blue Valley services.

The plaintiff Terri Baker brings monetary, declaratory, and injunctive relief claims in the Pretrial Order under 42 U.S.C. § 1983 against Mark Schmidt, in his official capacity for the Blue Valley School District. Terri contends that Blue Valley enforces the Kansas Commissioner's Handbook, as pertaining to Terri and S.B., which violates the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

**MULTIPLE ENROLLMENT**

Kansas provides a right to school choice and for multiple enrollment status. S.B. is enrolled in Blue Valley under the dual enrollment statute. Blue Valley insists that S.B. attend at its public school building and receive Special Education under the K.S.A. 72-3463 conditions.  While S.B. was unilaterally also enrolled in a private school that fact does not relieve Blue Valley from providing S.B. special education and related services to voluntarily placed private school students such as S.B.[1]  Blue Valley's enforcement of the Education Commissioner's Handbook no-religious-activities restrictions regarding Blue Valley's delivery of Special Education to S.B. do

---

[1] *See Veschi v. Northwestern Lehigh School District*, 772 A.2d 469 (Pa.Cmwlth.2001)(private school student can enroll dually in private and public school so as to receive IDEA-related services without attending public school). *Id*. at 475.

not provide Terri a genuine opportunity to participate by limiting Terri's school choice because of her religious exercise.

**KANSAS HANDBOOK IMPOSES UNCONSTITUTIONAL CONDITIONS WHICH BLUE VALLEY ADHERES TO IN HOW AND WHEN TO PROVIDE SPECIAL NEEDS AND RELATED SERVICES TO S.B.**

Dr. Schmidt not only stated Blue Valley adhered to all of the requirements stated in the Commissioner's KSDE Handbook but also adhered to Commissioner's interpretations of the Kansas statutes and KSDE regulations. This Court affords agencies no deference in interpreting the Constitution. *See U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1231 (10th Cir. 1999). It doesn't matter what Blue Valley or the Kansas Commissioner says about the interpretation of K.S.A. 72-3463, it is this Court's "emphatic" duty to declare what the law is. *Loper Bright Enters. v. Raimondo,* 144 S. Ct. 2244, 2261 (2024). However, this Court defers to Commissioner Watson's interpretations of the KSDE regulations.[2]

**BLUE VALLEY'S IMPOSITION OF UNCONSTITUTIONAL CONDITIONS**

Blue Valley is imposing the Commissioner's Handbook regulations and policies which are not required by the Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 or the U.S. Constitution:

(1) Kansas provides that exceptional children attending private schools to be entitled to a Free Appropriate Public Education through an IEP, upon request. K.S.A. 72-3462 and K.A.R. 91-40-45(c).

(2) K.S.A. 72-3421 imposes a requirement that "it shall be the duty of the parent of each exceptional child to require such child to attend school to receive the special

---

[2] *See Friends of the Floridas v. Bureau of Land Mgmt.,* No. CIV-20-0924 JB/GBW, 2024 WL 3952037, at *60 (D.N.M. Aug. 27, 2024) ("courts accord agencies what is known as *Auer* deference" as to agencies interpreting their own regulations).

education and related services which are indicated on the child's IEP or to provide for such services privately." Consent to stop services must be approved by an IEP team.

(3) Nothing in the IDEA or the U.S. Constitution restricts the delivery of special education services "in connection with religious courses, devotional exercises, religious training, or any other religious activity." K.S.A. 72-3463.

Religious activity is not prohibited in the public school setting. S.B. could choose to recite Psalm verses as part of any task he was given as an elective choice given by a public school teacher.  S.B. could do or say any number of things related to a public school curriculum that would constitute a "religious activity."  But having said that, the Commissioner's Handbook specifically prohibits the delivery of Special Education services to S.B. while S.B. properly chose those activities as was his choice given by a teacher.  Other than target religion for disparate treatment, what purpose does Blue Valley's enforcement of K.S.A. 72-3463 serve in denying S.B. Special Education services under those conditions?

K.S.A. 72-3463 states that "No special education services shall be provided in connection with religious courses, devotional exercises, religious training, or any other religious activity."  Under K.S.A. 72-3404 (Definitions) paragraph (i):

"Special Education" "means specially designed instruction provided at no cost to parents to meet the unique needs of an exceptional child, including:
(1) Instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (2) instruction in physical education.

S.B. is entitled to 72-3404's definition of "Special Education" from Blue Valley – and any other equitable special needs and related services that are designated on his IEP, all of which follow S.B. both into the public and private school sector,  Putting aside the targeting of religion in the Blue Valley school system, the scope of K.S.A.

19

72-3463 extends far beyond the boundaries of a Blue Valley school building.  Under the all-inclusive constraint of 72-3463, as defined by 72-3404, Blue Valley will not provide S.B. any special needs services of any kind[3] in S.B.'s "home," in S.B.'s private school "classroom," in any "institution" – or in "other settings" if they can be or are connected to "religious activities."  Because Terri has exercised Kansas school choice – and utilized "ministers" of her choosing, including herself, Blue Valley disqualifies S.B. from the delivery of "Special Education" in all of the 72-3404 settings.  This penalizes Terri for her right to associate with and then to choose her ministers. *See Peck v. McCann*, 43 F.4th 1116, 1132 (10th Cir. 2022); *Our Lady of Guadalupe Sch. v. Morrissey-Berru,* 140 S. Ct. 2049, 2061 (2020).  Blue Valley's disqualification of S.B. having Special Education services delivered to S.B. violates the church autonomy doctrine.  *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 657 (10th Cir. 2002). This doctrine affirms Terri's fundamental right "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Id.* at 655.  This doctrine protects Terri and her employment decisions as to even non-ministers which are rooted in her religious beliefs, practices, or observances.

Blue Valley has enforced the religious activity connection contained in the Commissioner's Handbook as to Terri and continues to avow a credible threat of enforcement of the Handbook's religious activity disqualifications.  *Peck* at 1132.

---

[3] K.S.A. 72-3463 also applies to "parentally-placed private school children." Ex. 1, p.119 (citing K.A.R. 91-40-43(e); p. 226.

Neither the Handbook nor K.S.A. 72-3463 are "moribund" law. *Speech First, Inc. v. Fenves,* 979 F.3d 319, 336 (5th Cir. 2020). Blue Valley is well aware S.B. is not receiving the services designated in S.B.'s IEP of which the Handbook directs Blue Valley to notify officials subjecting S.B. to Kansas Child in Need of Care proceedings and criminal sanctions for truancy. K.S.A. 72-1113; Kansas Attorney General Opinion 2000-16. The Handbook's mandate for Blue Valley is similar to the "any person" filing a complaint against a person. *See 303 Creative LLC v. Elenis*, 6 F.4th 1160, 1174 (10th Cir. 2021), *rev'd on other grounds,* 143 S. Ct. 2298 (2023).[4]

LOFFMAN

Since the Court issued its June 25, 2024, preliminary ruling, the Ninth Circuit issued a ruling in *Loffman v. California Dep't of Educ.,* No. 23-55714, 2024 WL 4586970 (9th Cir. Oct. 28, 2024). In that case numerous Amicus briefs were filed, including Attorney General briefs of the Kansas A.G.'s office. https://www.courtlistener.com/docket/67826229/chaya-loffman-v-california-department-of-education/ (Nov 1, 2023 Amicus brief from A.G.s). In *Loffman*, the 9th Circuit ruled that California's exclusion of religious schools from accessing state-administered special education funds violates federal law. The Jewish parents of exceptional children in *Loffman* sued the California Department of Education and

---

[4] *See 303 Creative,* 6 F.4th at 1174 (finding that "any (would be) customer" who is refused service "may file a complaint and initiate a potentially burdensome administrative hearing," weighing in favor of standing), and *Colorado Union of Taxpayers, Inc. v. Griswold*, No. 22-1122, 2023 WL 5426581, at *4 (10th Cir. Aug. 23, 2023) (finding the fact that any party can file a complaint that could trigger an enforcement action by the state supported standing under this factor).

various officials in the Los Angeles Unified School District regarding California's nonsectarian school requirement for the delivery of special education services. California had a requirement that nonpublic schools (NPS) with which it contracted to provide students with disabilities free appropriate public education (FAPE) had to be nonsectarian. "All three families want their children to receive the full panoply of disability services for which they are eligible in public school, but in an Orthodox Jewish setting and at public expense." *Loffman* at *3. This nonsectarian requirement is functionally the same as the statutory 72-3463 elimination of religious activities in a school as a condition for the delivery of special needs services.

*Loffman* recognized that the "IDEA provides several different ways in which children with disabilities may receive publicly funded services, including placement by parents in a private school without an IEP but with the potential to receive 'equitable services'…as well as placements by a public agency, either in a public school with an IEP…. or in a private school with an IEP." *Loffman* at *5. "For purposes of providing equitable services, the IDEA does not differentiate between students enrolled by their parents in religious schools as opposed to secular schools." *Id. Loffman* recognized that "States make a continuum of placements available for the provision of a FAPE, from regular public school classrooms to separate classes, separate schools, home instruction, or instruction in hospitals and institutions." *Id.* (citing 34 C.F.R. § 300.115). *Loffman* at *3:

> Parent Plaintiffs have plausibly alleged that the nonsectarian requirement violates their rights under the Free Exercise Clause. We conclude that the statute on its face burdens the free exercise rights of parents because it prohibits parents from advocating for a sectarian placement. Because the nonsectarian requirement is not

neutral to religion, strict scrutiny applies. We conclude that the State Appellee has failed to demonstrate that California's nonsectarian requirement satisfies the applicable strict scrutiny standard of review.

Similar to Terri, the Jewish parents also wanted the Special Education benefits to follow their children into a private religious school:

> Parent Plaintiffs contend that the nonsectarian requirement stands in the way of M.L., K.T., and N.P. receiving the full benefits of the IDEA in the educational context that their faith compels. Although they acknowledge that local educational agencies ultimately make NPS placement decisions, Parent Plaintiffs argue that the nonsectarian requirement injures them by preventing them, at the very least, from advocating to the local educational agency that "no appropriate public education program is available," and thus that their child should be placed in an Orthodox Jewish NPS.

*Loffman* at *11. Similar to what 72-3463 effectuates in skewing Kansas school choice:

> California's nonsectarian NPS requirement blocks religious schools from ever qualifying as NPSs. Thus, N.P., while possibly qualifying for an NPS placement, could not, under any circumstances, be placed in a religiously affiliated NPS. Thus, the Peretses have plausibly alleged an injury to their ability to advocate for placement in a religious NPS that is fairly traceable to California's nonsectarian requirement and redressable by the sought-after injunction.

*Id.* at *12. *Loffman* recognized that:

> Any religiously affiliated school seeking to enter into an NPS contract in California must choose whether to maintain its religious affiliation or to serve as an NPS eligible for consideration by the LEA in determining whether it may be in the best position to provide an IEP for an individual child. Religious entities that are equally or better qualified than secular ones to provide special education and related services are disqualified solely because they are "owned, operated, controlled by, or formally affiliated with a religious group or sect, whatever might be the actual character of the education program or the primary purpose of the facility."
>
> As a result, families like the Parent Plaintiffs who would otherwise advocate for placement in religiously affiliated NPSs are unable to do so—solely because of the would-be NPSs' religious affiliation. As we have previously recognized, a statutory scheme that requires a family to "forgo a sectarian education ... in order to receive" special education benefits otherwise available in a private school setting imposes a "burden on their free exercise rights."
>
> For most parents of children with disabilities, the IDEA statutory scheme forces parents to choose either the full benefits of the IDEA or education in a religious context.

*Id.* at \*15-16. *Loffman* held that the nonsectarian requirement:

> removes the possibility of a religiously affiliated NPS from the placement options for which a parent may advocate in its discussions with the local educational agency. Parent Plaintiffs are required to choose between the special education benefits made available through public school enrollment (and subsequent referral to a private nonsectarian NPS) and education in an Orthodox Jewish setting. Thus, we conclude that like the programs at issue in *Espinoza* and *Carson II*, California's nonsectarian requirement burdens "not only religious schools but also the families whose children attend or hope to attend them," including Parent Plaintiffs.

*Id.* at \*16. *Loffman* held that "because this presents a 'tendency to coerce' them 'into acting contrary to their religious beliefs,' we find that Parent Plaintiffs have alleged a cognizable burden on their free exercise of religion. *Id.* Similar to the *Loffman* plaintiffs, Terri asks that the public benefits of Special Education not be restricted under the anti-religious conditions of Blue Valley ("Plaintiffs do not seek a government contract. Instead, Parent Plaintiffs ask that a public benefit—state funding of NPS placements for disabled students—not be restricted to those seeking placement in nonsectarian school"). *Id.* Terri objects "to the conditioning of public [benefits] for [S.B.] school on that school's nonreligious character." *Id. Loffman* concluded that the nonsectarian requirement "easily" fails the neutrality test. *Id.*

### BLUE VALLEY VIOLATES THE FREE EXERCISE CLAUSE BY TARGETING RELIGION

The Handbook's imposition by Blue Valley and its interpretation of K.S.A. 72-3463 which Blue Valley adheres to is facially offensive to the U.S. Constitution. In *Lukumi*, the Supreme Court struck down a set of city ordinances that were neutral on their face but had the "impermissible object" of singling out the disfavored religious practice of animal sacrifice. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 524, 534 (1993) (holding that the "ordinances may be treated

24

as a group for neutrality purposes"). *Id.* at 540. *Lukumi* analyzed their practical impact because "the effect of a law in its real operation is strong evidence of its object." *Id.* at 535. *Lukumi* concluded that the laws were not neutral, since in practice they acted as "religious gerrymanders." *Id.* at 534. Analyzed as a whole, so too here. None of the framework is accidental. Evidence of a law's lack of neutrality can come from its "historical background," the "series of events" spurring its enactment, and "contemporaneous statements" made by lawmakers. *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,* 138 S. Ct. 1719, 1731 (2018) (quoting *Lukumi*, 508 U.S. at 540).

**KANSAS' FRAMEWORK VIOLATES THE FREE EXERCISE CLAUSE BY IMPOSING THE SAME EXCLUSION FROM A PUBLIC BENEFITS PROGRAM INVALIDATED IN *CARSON***

Blue Valley's enforcement of the Commissioner's Handbook requirements disqualifying S.B. from receiving Special Education services when they are "in connection with religious courses, devotional exercises, religious training, or any other religious activity" interferes with Terri's selection of herself or other key individuals in accordance with her religious convictions under the "ministerial exception." *See Our Lady of Guadalupe Sch*. The Religion Clauses protect the right of churches and other religious institutions to decide matters "of faith and doctrine' without government intrusion." *Id.* at 2060 (citing *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC.,* 565 U.S. 171, 181 (2012)). One such area protected from government intrusion is the selection, employment, or dismissal of those "entrusted with the responsibility of transmitting the [Christian] faith to the next generation.'" *Id.* The Supreme Court has twice applied this ministerial exception in the context of teachers at religious schools. *See Our Lady*, 140 S. Ct. at 2064;

*Hosanna-Tabor*, 565 U.S. at 192. Terri is a "minister" in her home school as well as those she utilizes to teach S.B. in mentoring and discipling in the Christian faith.

Terri has a right to expressive association which Blue Valley's denial of Special Education services to S.B. because of Blue Valley's religious activity prohibition violate *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000). The First Amendment protects the rights of a group to "associate with others in pursuit of ... educational [and] religious ... ends." *Id.* Kansas provides for school choice. The freedom to associate with others also includes the freedom not to associate with others if doing so would compromise the associating group's expression of beliefs. *Id.*; *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557 at 572–73 (1995). Blue Valley demands that Terri associate herself with the secular requirements of Blue Valley in order to qualify for the delivery of Special Education to S.B. in any defined setting under K.S.A. 72-3404. This is a significant burden on Terri's religious expression and triggers strict scrutiny.

Under Blue Valley's policy adhering to the Commissioner's Handbook's no-religious-activity restriction, this forces Terri to choose between adhering to her religious beliefs and risk (actually in fact suffer) exclusion from Blue Valley's delivery of Special Education services or complying with Blue Valley's no-religious-activity rule. Under the Free Exercise Clause, Blue Valley may not exclude S.B. from special needs benefits because Terri is religious or does religious things in her right to school choice. In the specific context of exclusion from participation in educational benefits programs, the Supreme Court has thrice held that a state may not exclude religious

observers from receiving otherwise available educational benefits because of a school's religious status or practice. *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022) ("By conditioning the availability of benefits in that manner, Maine's tuition assistance program . . . effectively penalizes the free exercise of religion."); *Espinoza v. Montana Department of Revenue,* 140 S. Ct. 2246 (2020) ("State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious."); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017) ("To condition the availability of benefits upon a recipient's willingness to surrender his religiously impelled status effectively penalizes the free exercise of his constitutional liberties"). Blue Valley penalizes Terri in using religious curriculum and using herself to teach S.B. This violates Blue Valley's standards of not delivering Special Education services. Like in *Trinity Lutheran*, Terri asserts her "right to participate in a government benefit program without having to disavow its religious character." *Id.* at 463. But Blue Valley's policy adhering to the requirements set out in the Commissioner's Handbook infringe on that right, which forces Terri into the unconstitutional choice of abandoning religiously motivated practices or foregoing otherwise available public benefits. *Espinoza*, 140 S. Ct. at 2261. The First Amendment forbids imposing such a choice.

The teacher control and the religious sterilizing conditions of K.S.A. 72-3463 make the receipt of free special education benefits – as well as the delivery of those services by Blue Valley – conditional on the abandonment of religious identity, effectively disqualifying Terri and her chosen teacher ministers "solely because they

are religious." *Espinoza*, 140 S. Ct. at 2261. "That is discrimination against religion." *Carson*, 142 S. Ct. at 1998.

### BLUE VALLEY'S FRAMEWORK VIOLATE THE FREE EXERCISE CLAUSE BECAUSE THEY ARE NOT GENERALLY APPLICABLE

Blue Valley's standard, based upon the Commissioner's Handbook, is not neutral and generally applicable. A law is not generally applicable if it treats "any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021); see also *Fulton*, 141 S. Ct. at 1877 ("A law … lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way"). Special needs services are designed to be utilized in the "general education curriculum." Commissioner Watson specifically opined that a "general education curriculum" is not limited to a public school curriculum as mis-interpreted by Dr. Schmidt.  According to Blue Valley, parents educating their special needs student in public and private nonsectarian schools obtain the full benefits of the Special Education services.  However, parents who properly elect under Kansas school choice to utilize sectarian schools which have a different general education curriculum including all of the religious-activity things K.S.A. 72-3463 broadly prohibits do not.

Thus religious parents and sectarian schools are not able to obtain those benefits during – actually "in connection with" – that private general education curriculum.  Blue Valley's enforcement of the Commissioner's Handbook is a religious gerrymander with categorical exclusions of: free Special Education services when

they are in connection with "religious courses, devotional exercises, religious training or any other religious activity."

**BLUE VALLEY VIOLATES THE FREE EXERCISE CLAUSE BY INFRINGING ON THE RIGHTS OF TERRI TO DIRECT THE RELIGIOUS EDUCATION OF S.B.**

Blue Valley also impinges on "the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). "[T]he traditional interest of parents with respect to the religious upbringing of their children" is a "fundamental right[] and interest[]" and is "specifically protected by the Free Exercise Clause of the First Amendment." *Id.* at 214. It is also "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Incursions on this fundamental right trigger strict scrutiny. *Yoder*, 406 U.S. at 214; *Employment Division v. Smith*, 494 U.S. 872, 881 (1990) (citing *Yoder*, 406 U.S. 205). Terri, like many other religious parents, strive to raise their children according to their shared Christian faith. But Blue Valley coerces Terri and interferes with her ability to do so. By conditioning the use of otherwise generally available benefits for the delivery of Special Education under the anti-religious requirements of Blue Valley it coerces and requires Terri to abandon core elements of what makes her religious in the first place.

**BLUE VALLEY'S REQUIREMENTS VIOLATES THE FREE SPEECH CLAUSE BECAUSE IT COMPELS SPEECH BY PARENTS AND RELIGIOUS SCHOOLS**

Blue Valley's anti-religion conditions for the delivery of special education services violates Terri's rights under the Free Speech Clause by coercing and/or forcing her to allow speech that she disagrees with. Blue Valley requires Terri to

endorse a secular ideology – if she wants S.B. to have the Special Education services delivered by Blue Valley. These religious expression provisions ban speech, and then distorts speech to require Terri to express viewpoints with which she does not agree. *Cressman v. Thompson*, 798 F.3d 938, 950 (10th Cir. 2015). But Blue Valley cannot "compel [a] speaker to alter [its] message by including one more acceptable to others." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston,* 515 U.S. 557, 581 (1995); *see also W. Va. Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943).

### BLUE VALLEY'S REQUIREMENTS VIOLATES THE FREE SPEECH CLAUSE RIGHT OF EXPRESSIVE ASSOCIATION

As stated previously, Blue Valley's no-religious-activity requirement interferes with Terri's expressive association rights. Terri must associate herself at all times with a teacher controlled by Blue Valley to teach S.B. in order to receive Blue Valley's special education services. A Blue Valley teacher does not become a pastor simply because the teacher provides services while S.B. is drawing baby Jesus in a manger—no more than a deaf interpreter becomes a priest interpreting Mass for the deaf special needs student.[5] A deaf student's public-school-paid interpreter is not providing what Blue Valley calls "religiously infused" interpreter services while the student was helped during his Catechism class curriculum. The secular and neutral services remain that despite being used for religious purposes or uses. The interpreter was not, even during Catechism, "inculcating any religious messages" even though

---

[5] *Zobrest v. Catalina Foothills School District*, 509 U.S. 1 (1993) (public school providing a sign-language interpreter to a deaf student at a Catholic high school as part of a federal program for the disabled as a result of parent's private choice).

she was interpreting Catechism. "The religious nature of a recipient should not matter to the constitutional analysis, so long as the recipient adequately furthers the government's secular purpose." *Mitchell v. Helms*, 530 U.S. 793, 825 (2000). A "government interpreter does not herself inculcate a religious message – even when she is conveying one." *Id.* at 822.

### BLUE VALLEY'S CONDITIONS VIOLATES THE ESTABLISHMENT CLAUSE BECAUSE IT INVITES EXCESSIVE ENTANGLEMENT UNDER *CARSON*

What exactly constitutes a "religious" course or a "devotional exercise," "religious" training or the broad "religious activity" as required by Blue Valley? *Carson* also explained that "scrutinizing whether and how a religious school pursues its educational mission" would "raise serious concerns about state entanglement with religion and denominational favoritism," both of which violate the Establishment Clause. *Carson* at 2001. Blue Valley's anti-religion conditions do just that. The "inquiry into the recipient's religious views required by a focus on whether a school is pervasively sectarian is not only unnecessary but also offensive. It is well established, in numerous other contexts, that courts should refrain from trolling through a person's or institution's religious beliefs." *Mitchell* at 828. As *Carson* recognized, Blue Valley's interference in the internal beliefs of S.B. or Terri to discern "religious activity" "is anathema to our constitutional order." 142 S. Ct. at 2001.

### BLUE VALLEY'S FRAMEWORK VIOLATES THE FIRST AMENDMENT RIGHT OF RELIGIOUS AUTONOMY

Blue Valley violates the right of religious autonomy as well. Religious autonomy, which arises from the nexus of the Free Exercise and Establishment clauses, was what *Carson* had in mind when it reminded Maine that "educating

young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* (citing *Our Lady*, at 2064, and *Hosanna-Tabor*, 565 U.S. at 192). The right to select who will carry out these important functions is at the heart of religious autonomy. For that reason, cases like *Hosanna-Tabor* and *Our Lady* have held that teachers at these homeschools and other private sectarian schools who are responsible for imparting the faith to the next generation are "ministers" whose employment is exempt from state and federal employment discrimination law. *Our Lady*, 140 S. Ct. at 2064. Likewise, religious schools have the constitutional right – long protected in Kansas and Federal employment law – to hire non-ministerial staff that support their religious mission in word and deed. *See, e.g., Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 329 (1987) (construing Section 702 of Title VII of the Civil Rights Act of 1964 to allow a church-owned gym to discharge a janitor for failing to conform to the church's teachings in his personal life); *Bryce v. Episcopal Church*, 289 F.3d 648, 660 (10th Cir. 2002) (recognizing religious autonomy right to make "personnel decision[s] based on religious doctrine"). Blue Valley has made it clear that it does not defer to the religious autonomy of Terri in its special needs program: it strips parents and religious private schools of their hiring rights and to enjoy a religious general educational curriculum which violate religious autonomy.

### BLUE VALLEY IMPOSES UNCONSTITUTIONAL CONDITIONS ON TERRI

At a basic level, Blue Valley controls Terri's exercise of school choice as well as her religious outworking and runs headlong into the doctrine of unconstitutional

conditions.[6]  A "State may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom … even if he has no entitlement to that benefit." *Mahanoy*, 141 S. Ct. at 2053-54 (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013)) (AOSI). Blue Valley's adherence to the Commissioner's Handbook is a no-aid policy which "belong to a more checkered tradition shared with the [federal] Blaine Amendment of the 1870s which would have added to the Federal Constitution a provision similar to the state no-aid provisions, prohibiting States from aiding sectarian' schools." *Espinoza* at 2259.

### BLUE VALLEY CANNOT SATISFY STRICT SCRUTINY

Not all of Plaintiff's claims require a strict scrutiny analysis.[7] But for those that do, Blue Valley's religious-exclusion requirements all fail because they are not narrowly tailored to serve a compelling government interest.  "A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546.  Blue Valley purports to assert a compelling interest in not establishing religion. But as "explained in both *Trinity Lutheran* and *Espinoza*, such an interest in separating church and state more fiercely

---

[6] This is not new. In *Carson*, the First Circuit recognized that *Trinity Lutheran* and *Espinoza* "resonate[] with unconstitutional conditions doctrine in the First Amendment area more generally." *Carson*, 979 F.3d at 34 n.1.

[7] Where government targets religious exercise, attempts to interfere with church autonomy, or becomes entangled in religious affairs, a court must "'set aside' such policies without further inquiry" and without the need for a strict scrutiny analysis. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 n.1 (2022) (religious targeting); *see also Our Lady*, 140 S. Ct. at 2060 (church autonomy/entanglement).

than the Federal Constitution cannot qualify as compelling in the face of the infringement of free exercise." *Carson*, 142 S. Ct. at 1998. Although the federal scheme unequivocally states the exceptional child should receive his services in the "Least Restrictive Environment" – meaning "push in" services rather than "pull-out" services – that requirement is jettisoned by Blue Valley. All exceptional children in private schools must be pulled out, according to Blue Valley, and placed in its secular school environment to receive special needs services. Schools are not permitted by Blue Valley to push-in special needs services in the religious private school curriculum.

**STANDING**

"The doctrine of standing gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014). For First Amendment claims, "two types of injuries may confer Article III standing to seek prospective relief," even if a plaintiff has "never been prosecuted or actively threatened with prosecution." *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003); *Colorado Union of Taxpayers, Inc. v. Griswold*, No. 22-1122, 2023 WL 5426581, at *1 (10th Cir. Aug. 23, 2023). The first type of injury requires only that a plaintiff intends to "engage in conduct that would … arguably violate the law" and that such conduct would "give rise to a credible fear of an enforcement action." *Griswold*, 2023 WL 5426581, at *1. The second type of injury occurs where a plaintiff is "chilled" from doing constitutionally protected conduct, typically speech. Under the latter theory,

the plaintiff must provide (1) evidence that in the past they engaged in the type of speech or conduct affected by the challenged government action, (2) evidence that the plaintiff has a present desire, though no specific plans, to engage in such speech or conduct; and (3) a plausible claim that the plaintiff has no intention to engage in such speech or conduct because of a credible threat that the law will be enforced. *Peck v. McCann,* 43 F.4th 1116, 1129-31 (10th Cir. 2022). Under either of these two standing theories, the third "credible threat" prong of this test is the same and includes a multi-factor analysis. *Griswold*, 2023 WL 5426581, at *3, n.4 ("We have never interpreted a 'credible fear' differently based on the plaintiff's theory of standing"). The credible-threat prong "is not supposed to be a difficult bar for plaintiffs to clear in the First Amendment pre-enforcement context." *Peck*, 43 F.4th at 1132. And the "threat of prosecution is generally credible where a challenged provision on its face proscribes the conduct in which a plaintiff wishes to engage, and the state has not disavowed any intention of invoking the provision against the plaintiff." *United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 901 (10th Cir. 2016). As set forth in this briefing, S.B. and Terri are captured in the Kansas Special Education framework. S.B. will have an IEP until the Blue Valley IEP Team dissolves it. It means Terri is under an ongoing duty to provide special needs services in the manner dictated by Blue Valley – all of which she is currently violating by not providing the services – and in educating S.B. in a private school which does all of the things K.S.A. 72-3463 prohibits. Terri is not sending S.B. to attend Blue Valley's classroom to receive special needs services because it is devoid of what S.B. needs – it is "godless" – and in no way

fulfills S.B.'s "other educational needs." What is left? The same fate happens in the private school arena because Blue Valley requires those religious private school curriculums to also be "godless" for S.B. to be eligible for Blue Valley's delivery of Special Education services to S.B. S.B. has been denied services because of religion. Blue Valley says it will never provide special needs services to S.B. at any private school during any religious curriculum or activity. S.B. is injured because he has not received those benefits and in the manner required. S.B. is also injured because Blue Valley targets S.B. and his religious curriculum for disfavored treatment. According to Blue Valley, nonsectarian general education curriculums are the only curricula qualified to receive its special needs benefits. It is thus impossible for S.B. to obtain the core benefit of school choice because of connections to religious activities. Terri is not qualified to provide the services designated on S.B.'s IEP in the manner required. Irrespective of whether Terri can afford to pay for special education and related services, Kansas forces her to do so. She must choose between the general education curriculum in a public or nonsectarian school with its FAPE benefits or instead exercise the parental rights of school choice and giving S.B. a Christian education in the manner of her religious general education curriculum without FAPE.

CONCLUSION

Supreme Court decisions make abundantly clear that Blue Valley may not exclude Terri from otherwise available education services through discriminatory "nonsectarian" requirements. Federal constitutional rights do not depend on "state law labels." *Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr,* 518 U.S. 668, 679

(1996). The Commissioner's Handbook targeting religion is a "shameful pedigree." S.B. has an educational need to learn about God and the Christian Gospel. His mother has a right under Kansas law to choose a religious school with its own general education curriculum which Terri has done. Blue Valley will never design an IEP so that S.B. can make progress in his chosen general education curriculum because of the Kansas Handbook requirement that it will not happen because of religion: that no Special Education will be given to S.B. if it can be connected in any way to his "religious courses, devotional exercises, religious training or any other religious activity." *Carson* held that a state could not justify discrimination by claiming it was just preventing organizations from using state aid in religious ways. Use-based religious discrimination is just as "offensive to the Free Exercise Clause" as status-based discrimination. *Id.* at 2001.

This case also poses another single, straightforward question: May Blue Valley deny the delivery of all Special Education to S.B. of its public benefits when they are connected to S.B.'s religious curriculum in his "classroom," "home," "hospital," "institutions," "other settings," and "physical education" – all of the activities the Commissioner's Handbook forbids Blue Valley's IEP assistance in? The Supreme Court has "repeatedly" answered "No," holding in *Carson*, *Espinoza*, and *Trinity Lutheran* that "the exclusion of [a religious entity] from a public benefit for which it is otherwise qualified, solely because it is [religious], is odious to our Constitution." *Trinity Lutheran* at 467. That "'unremarkable' principle" begins and ends this case. *Carson* at 780. Blue Valley has joined a long line of governments who have used the

word "sectarian" "to push religious minorities out of public life" – particularly disfavored minorities. By virtue of Blue Valley's nonsectarian activity restrictions, under no circumstances may S.B.or Terri's schooling ever act religious if S.B. is ever to receive Special Education services from Blue Valley. Under no circumstances may a religious family ever successfully have their child receive those services in such a school. That is a clear-cut violation of the First Amendment, forcing religious individuals and schools to choose between their faith and a public benefit for which they would otherwise qualify. The no-religious-activity restriction Blue Valley enforces therefore must be relegated to the dustbin along with the other laws the Supreme Court has "not hesitate[d]" to strike down as part of the "shameful pedigree" of religious discrimination in this country. *Mitchell v. Helms*, at 828.

As K.S.A. 72-3404 states, Blue Valley's obligation to deliver special education goes far beyond its own buildings – into a "classroom, in the home, in hospitals and institutions, and in other settings." Yet Blue Valley insists S.B.'s classroom and home be religiously sterilized if it is to receive Blue Valley's delivery of services to S.B. Blue Valley asserts that it pay for delivery *only* into a secular curriculum but the contradiction in terms was expressly rejected in *Carson*, where Maine made the same argument. "Public Education" in the context of the IDEA means "publicly funded" not "publicly owned" or "publicly controlled." Blue Valley essentially requires Terri to act as an adjunct of Blue Valley's secular education. Blue Valley requires Terri to provide a secular kind of public education to S.B. as a condition to and while receiving Blue Valley's services. Under decades-old precedent, Blue Valley's anti-religion

restrictions imposed upon its delivery of special education *anywhere* amounts to a "indirect coercion or penalt[y] on the free exercise of religion." *Carson*, 596 U.S. at 778. And because Blue Valley's restrictions "plainly excludes [S.B.] from government aid solely because of religious status," it cannot survive. *Espinoza* at 2255.

To hold that Terri can choose her own religious curriculum for S.B. while Blue Valley bars S.B. or her from acting religious in order to qualify for Blue Valley services would be to embrace the distinction between religious "status" and "use" that the U.S. Supreme Court rejected in *Carson*. To convey to a religious adherent that she can participate in a government program alongside other parents and schools but cannot act out S.B.'s or her religious beliefs – if to obtain BV special education benefits – shows hostility to religion, not neutrality. *See Fulton*, at 1877 ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature").

But what makes Blue Valley's discriminatory policy especially egregious is that it limits opportunity for the very students who need tailored, individualized educational programs the most of all. *See* NICOLE GARNETT, UNLOCKING THE POTENTIAL OF PRIVATE-SCHOOL CHOICE, MANHATTAN INSTITUTE POLICY REPORT, at 8 (March 2023) (available at https://shorturl.at/iBJVY) ("students with disabilities" are chief among the "children who are not well served by district public schools"). The entire point of the IDEA was to satisfy disabled children's "unique needs" and adapt their educational experiences to their specific disabilities. 20 U.S.C. §1400(d)(1)(A). The plaintiff S.B. provides a perfect example because public schools have proven wholly

unable to satisfy S.B.'s other educational needs which are religious. Blue Valley will never design an IEP for S.B. to meet his religious educational need because of its no-religious-activity requirement. Not only is S.B. denied, Terri cannot even compete to receive those services unless she converts to secular education. *See Trinity Lutheran* at 463 (The express discrimination against religious exercise here is … the refusal to allow [Terri] – solely because it is [religious] – to compete with secular organizations for [the benefit]").

Blue Valley says it permits Terri to practice her religion however she sees fit. *Trinity Lutheran* forcefully rejected this precise argument: "Of course, Trinity Lutheran is free to continue operating as a church … but that freedom comes at the cost of automatic and absolute exclusion from the benefits of a public program for which the Center is otherwise fully qualified." *Id.* at 2022. Blue Valley's enforcement of the Commissioner's Handbook containing the no "religious courses, devotional exercises, religious training or any other religious activity" language violates the First Amendment and Equal Protection clause of the Constitution. As *Mitchell* recognized, those services remain neutral and nonideological even though they are provided during all of the activities 72-3463 lists. The plaintiff Terri requests oral argument on this motion pursuant to D. Kan. Rule 7.2.

<table>
<tr><td>

/s/Linus L. Baker KS 18197
6732 West 185th Terrace
Stilwell, Kansas 66085
Telephone:  913.486.3913
Fax:          913.232.8734
Email: linusbaker@prodigy.net
Attorney for the plaintiffs

</td><td>

**CERTIFICATE OF SERVICE**

On this 15th day of November, 2024, the above document was filed with the Court's CM-ECF system which will provide notice to all counsel of record.
/s/Linus L. Baker
Linus L. Baker

</td></tr>
</table>