UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Terri Baker *et al*

                    Plaintiffs,

v.                                                        Case No. 5:23-cv-04022-TC-TJJ

Randall Watson *et al*

                    Defendants

**PLAINTIFF TERRI BAKER'S MEMORANDUM IN OPPOSITION TO BLUE VALLEY'S
MOTION FOR SUMMARY JUDGMENT
RESPONSE TO FACTS[1]**

17. Controverted.  The email chain never says S.B. was being withdrawn. ECF 120-2, p.5.  The email from Mr. Baker tells Thompson "what would be the proposed days/ duration at the school." Thompson responds with a question: "If S.B. is being homeschooled…." Terri wrote on September 2, 2020, that "I don't think S.B. qualifies for school enrollment anyway as he isn't vaccinated.  We are considering options and I think school will require masks which S.B can't really do…."   The next communication that happened is what Thompson said: "S.B. has been withdrawn from the Blue Valley School District." ECF 120-2,p.11.  Mr. Baker responded with the below email objecting and telling Blue Valley they had not withdrawn S.B.:

From: linusbaker@prodigy.net <linusbaker@prodigy.net>
Date: Thursday, October 22, 2020 at 9:21 AM
To: Williams-Thompson, Lisa A. <LWilliamsThompson@bluevalleyk12.org>
Subject: October 14 letter

EXTERNAL EMAIL: Do not click any links or open any attachments unless you trust the sender.

Ms. Thompson

Terri received this letter yesterday.  I am not sure where you obtained your assumption but it is incorrect.  If you have some communication that ██████ is enrolled and that Terri has subsequently withdrawn his attendance please bring it to my attention.  With your letter it will be assumed that Blue Valley is now denying services to ██.

Linus L. Baker

---

[1] Plaintiff only identifies the paragraphs in which she controverts for purposes of Blue Valley's motion.

18. Object as argumentative and lack of foundation.  Admitted the letter was sent but denying as argumentative the "District's understanding" or that it justified unilaterally un-enrolling S.B.  See above email that was sent October 22, 2020.

20. Admitted BVLY made an offer but the offer required the plaintiff to accept unconstitutional conditions in receiving services. At the time Blue Valley (BVLY) refused to enroll S.B. which is necessary to even send a child to the school. ECF 121-6, p.135:7-18; ECF 121-6, p.81:15-p.62:14; ECF 121-10 (Schmidt) Ex. 9, p.40:22-p.41:17; p.43:7-15.

22. Controverted.  The citation does not support the assertion.  In order to ask for push in services S.B. had to be enrolled which BVLY refused to do.  Terri stated "We did not. · We wanted them to come to us. Push in, instead of -- until how I was homeschooling."

23. Controverted.  Push in services are defined in as the Least Restricted Environment requirement and is for the student's general education curriculum. ECF 121-11 (Watson) p.159:6-17.

28. Controverted. The citation does not support the assertion. Terri testified that "I just think they're free -- they let you be the parent and they let that burden on you. · They concentrate on reading, writing. · And it's more Montessori type, so it's great." ECF 121-6, p.66:18.

32. Controverted. Object to the phrase "Preferred outcome" as vague and argumentative. Terri wants push in services without the unconstitutional conditions attached.

34. Controverted.  Terri wants services without the unconstitutional conditions.  ECF 121-6, p.135:7-18.  Terri wants push in services without the unconstitutional conditions. ECF 121-6, p.78:11 "I've said it before. I want them to push in services wherever I have S.B. at school. And I pay my taxes and I should get the same service."

38. Controverted.  Object as lack of foundation ("best of my knowledge"). Admitted that Terri has not requested BVLY to provide any "religious" instruction to S.B. – Terri has that covered. She simply wants special needs services to be provided while she or another teacher is using a curriculum which can include religion.

39. Controverted. The citation does not support the assertion. It is objected to as argumentative ("services containing some religious component"), hearsay and without foundation ("it is my understanding" and "Blue Valley first learned"). Dr. Schmidt does not say how he knows the entire world of BVLY knowledge. Terri never said and never wanted a special educations services "with a religious component." Terri wants special educations services delivered during all of the things the Commissioner's Handbook prohibits, which BVLY enforces under K.S.A. 72-3463.

42. Controverted. The citation does not support the assertion. Terri actually testified that: "A. Well, if you're pushing in at the school that he's at and they're having religious activities, would they be able to do that?" ECF 121-6, p.72:21.

43. Controverted. The citation does not support the assertion and is argumentative. Saying that Terri wants S.B. in a "good environment" and to learn "good things" is a religious conviction. Terri wants S.B. to have a curriculum that includes religion. ECF 121-6, p.134: 14-23; p.135:7-18.

52. Controverted. Object as a legal conclusion and vague as to the meaning of "private provision." Object as to lack of foundation and speculation ("I do not believe"). BVLY does enforce K.S.A. 72-3463 and has done so regarding S.B.

54. Controverted. Vague and argumentative as to the meaning of "presented." If "presented" means showing up at the school house front door, a child cannot just walk up to a school and go to class – he must first be enrolled – which BVLY refused to do. ECF 121, Ex. 9, p.40:22-p.41:17; p.43:7-15; Ex. 9, p.44:2-15; p.45:3-19; Ex. 5 p. 31:1-6; p.32:10-18; p.139:13-23; p.182:10-23.

## ADDITIONAL FACTS

1. S.B. has attended and currently attends a private religious school called The Daniel Academy since the beginning of the 2024-2025 school year. Pretrial Order, p.7.

2. Dr. Schmidt said that BVLY had un-enrolled S.B. and then refused to re-enroll S.B. for the 2023-2024 school year and said that BVLY had not enrolled S.B. and he didn't know why. ECF 121-10 (Schmidt Dep) p.104:3-p.107:20; p.110:4-10.

3. Dr. Schmidt inquired whether S.B. had been enrolled because it was important to see if S.B. was receiving special needs services. ECF 121-10, p. 117:8-p.119:8.

4. When asked why, attorney Melissa Hillman told him certain steps had not been completed.  But Hillman never told Dr. Schmidt what purported steps were needed: he wasn't expecting S.B. to just show up at school unless S.B. had been enrolled. ECF 121-10, p.107:7-20; p.113:1-p.114:5.

5. S.B., Terri's son, has an educational need to learn about God and the Christian Gospel of Jesus Christ as the Messiah for all mankind. ECF 121, Ex. 7; Ex. 5, p.22:17-18; p.23:1-18; p.24:1-19; p.28:12-24; p.49:17-p.50:12.

6. The BVLY IEP team is supposed to try and develop an IEP so that S.B. can make progress in his general education curriculum of his private religious school. ECF 121,Ex.10 p.153:4-7.

7. A private religious school has a general education curriculum which a parent can go to the school IEP team and ask for an IEP to make progress in that school's curriculum. ECF 121,Ex. 10 p. 152:22-p.153:7.

8. S.B.'s IEP could assist S.B. in memorization utilizing music but BVLY will not develop an IEP using music of a Biblical Hymn or Biblical verse. ECF 121, Ex. 10, p.134:1-24.

9. Despite Kansas providing for school choice, BVLY states S.B. must be enrolled at BVLY and obtain an IEP only designed to make progress in BVLY's general education curriculum. ECF 121, Ex. 10,p.122:1-12; p.123:7-19; p.125:9-17; p.126:8-12.

10. BVLY will not design S.B.'s IEP to meet his "other educational needs" if those educational needs involve religion. ECF 121, Ex. 10, p.132:10-15.

11. Dr. Schmidt agreed that BVLY will not provide special education services in connection with religious activities but that determining whether an activity was religious was "outside my expertise" and that he doesn't know. ECF 121, Ex. 9, p.58:1-19.

12. BVLY will not provide any special needs services to S.B. in S.B.'s non-secular general education curriculum because of K.A.R. 91-40-48 and K.S.A. 72-3463. ECF 121, Ex. 9 p.216:23-p.218:2; p.145:2-6.

13. BVLY would not permit its special education teacher to initiate having S.B. in drawing "three kings on their way to see baby Jesus" even if the special needs teacher thought it would help S.B. learn. ECF 121, Ex. 9, p.57:4-15.

14. BVLY will never provide push-in services for S.B. even when BVLY places S.B. in a private school placement. ECF 121, Ex. 9, p.56:2-23.

15. S.B. is entitled to receive special needs services from BVLY but in order for S.B. to receive those special needs services from BVLY, S.B. must first be enrolled in the BVLY school district. ECF 121, Ex. 9, p.40:22-p.41:17; p.43:7-15.

16. In order for S.B. to attend BVLY classes, S.B. must first be enrolled with BVLY school district. ECF 121, Ex. 9, p.45:3-19.

17. S.B. must be enrolled in the BVLY School District to receive FAPE from BVLY. ECF 121, Ex. 5 p. 31:1-6; p.32:10-18; p.139:13-23; p.182:10-23.

18. BVLY enforces the Special Education Handbook of KSDE which contains the language "no special education services shall be provided in connection with religious courses, devotional exercises, religious training or any other religious activity." ECF 121, Ex. 9 p.216:23-p.218:2.

19. Special needs services will not be provided to S.B. by BVLY during religious activities or his religious curriculum which is what Terri wants. ECF 121, Ex. 5, p.134:20-23; p.135:7-16.

20. Dr. Schmidt said Terri was not qualified to provide related services to S.B. such as occupational therapist services. ECF 121, Ex.9, p.69:18-p.70:25.

21. S.B. has not received the special education and related services designated in his IEP of which BVLY is aware of this fact. ECF 121, Ex. 5, p.30:7-13;p.86:17-24; p.89:4-16; p.90:1-10.

22. One of the reasons Terri has attempted to enroll S.B. in the BVLY school district is so that S.B. can obtain free services from BVLY. ECF 121, Ex. 5, p.127:21-p.128:1.

23. A parent may not revoke consent for the continued provision of a particular service or placement unless the child's IEP team certifies in writing that the child does not need a particular service or placement for which consent is being revoked in order to receive a free public education. ECF 121, Ex.1 p.22, 47, 145; Ex. 10 p.191:10-25.

**ARGUMENT**

**OVERVIEW | PLAINTIFFS BRING THIS FEDERAL CIVIL RIGHTS ACTION UNDER 42 U.S.C. § 1983**

**Count 1** alleges that BVLY, via the Commissioner's Special Education Handbook enforcing K.S.A. 72-3463 (72-3463), imposes "special disabilities on the basis of religious views or religious status" which triggers strict scrutiny.[2] It alleges that BVLY burdens Terri's religious exercise with its mandatory no-aid-to-religion conditions under 72-3463 and it requires Terri to choose between exercising her religious beliefs and the receipt of special needs benefits of FAPE.

**Count II** alleges that BVLY's burdening of Terri' exercise of religion is not one of general applicability because parents who choose government run schools or non-religious private schools are entitled to the full benefits of FAPE including an IEP designed to meet all of the educational needs of the student and can have special needs services delivered in all aspects of the student's curriculum while S.B. is denied the same benefits as he cannot have an IEP designed to meet all of his educational needs which include morality and religion as well as being denied the benefit of delivery of services while those educational needs are being met – i.e. all of the activities 72-3463 prohibits.

---

[2] Because 72-3463 fails the neutrality test (*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17 (2020) ("singles out" religion "for especially harsh treatment") "failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022). The Court does not need reach whether the scheme fails the general applicability test.

**Count III** The statutory framework interferes with Free Speech. The Regulation is still being misapplied by BVLY to prohibit all of the things 72-3463 prohibits. Plaintiff abandons about K.A.R. 91-4048(c)(2) being facially unconstitutional.

**Count IV** asserts an Equal Protection violation for all of the reasons stated in Count II. In addition, because Kansas provides for school choice, it violates Equal Protection to require exceptional children to attend the mandated K.S.A. 72-3461 school which requires a legal organization of the type that is exempt from federal income taxation under section 501 of the federal internal revenue code of 1954, and also conforms to the civil rights act of 1964 when other parents of other students are permitted to satisfy the compulsory school requirement without those requirements. 72-3463 violates Equal Protection for all of the reasons stated in Count II. It also prevents funding or use of funds equally.

**Count V** alleges unconstitutional conditions to receiving benefits for all of the reasons stated in Count II. S.B. cannot have all of his educational needs met because of the Commissioner's Handbook enforcing 72-3463 unless Terri foregoes her religious convictions, her right to religious autonomy, and right to parent in the manner she deems appropriate. Kansas requires Terri to accept the unconstitutional conditions of 72-3463 to receive FAPE and if she objects on religious grounds she must then provide those same services at substantial cost to her in order to remain faithful to her religious convictions. This framework coerces Terri to abandon her religious convictions because of money and to avoid having S.B. reported as a Child in Need of Care because he is not receiving the services designated in his IEP.

**Count VI** claims that because Kansas provides for school choice, and parents electing school choice are permitted to direct the entire education of their child in a religious curriculum, that the Commissioner's Handbook enforcing 72-3463 burdens Terri's right to direct S.B.'s education.  Capturing Terri in this private-duty-expense mandate for all of the special needs services designated in his IEP at her own expense, interferes with the right to direct that education. Kansas has converted a free federal government benefit into a reversed taxation and pseudo fine: that because a parent has refused the free special needs services because of religion Kansas punishes her decision by making her pay for the same services at her own expense.  BVLY refuses to acknowledge or design any IEP for S.B. to meet his educational needs for religious instruction because of its interpretation of K.A.R. 91-4048(c)(2) and 72-3463 and will not deliver services to S.B. while those particular educational needs are being met because of its interpretation of the regulation and the mandate of 72-3463.[3]

**BLUE VALLEY'S FAILURE TO PROVIDE FAPE IS A CONSTITUTIONAL PROBLEM BECAUSE OF THE COMMISSIONER HANDBOOK'S ENFORCEMENT OF K.S.A. 72-3463**

All offers of FAPE to S.B. by BVLY contained the unconstitutional poison pill of 72-3463.  Terri is not required to forgo her First Amendment rights in order for S.B. to receive FAPE from BVLY.  BVLY refused – and continues to refuse – to provide FAPE to S.B. without its unconstitutional conditions.  Based on the same, it says it will never design an IEP for S.B. to make progress in his general education curriculum to meet his "other educational needs" which encompass religion because of BVLY's adherence to the Kansas Commissioner's Special Education Handbook

---

[3] Taken together in any combination, the Court should also apply a heightened scrutiny to these hybrid "companion" claims. *Axson-Flynn v. Johnson,* 356 F.3d 1277, 1297 (10th Cir. 2004).

8

enforcing K.S.A 72-3463 which is unconstitutional. This is a systemic Constitutional problem in which a due process hearing officer cannot remedy.[4] These are "non-IDEA violations." *Padilla ex rel. Padilla v. Sch. Dist. No. 1 in City & Cty. of Denver,* 233 F.3d 1268, 1274 (10th Cir. 2000). S.B. has a unique educational need called "religious." One component of a FAPE is "special education" defined as "specially designed instruction... to meet the unique needs of a child with a disability." §§ 1401(9),(29). These provisions focus on "progress in the general education curriculum." §§ 1414(d)(1)(A)(i)(I)(aa), (II)(aa), (IV)(bb).

### U.S.C. § 1412(A)(10)(A)(VI)(II), 34 C.F.R. § 300.138(C)(2), AND K.A.R. 91-40-48 ARE FACIALLY CONSTITUTIONAL

Kansas school choice means that Kansas parents such as Terri Baker can acknowledge and meet her child's need for God, to be educated about God, to worship God, and to be taught by those who share the same values – while at school. School choice allows parents to acknowledge all of their child's educational needs as well as the way in which to meet those needs. These parents say that their children have an educational need for God and to learn about God. For Christians such as Terri, it is

---

[4] "Parents may bypass the administrative process where exhaustion would be futile or inadequate." *Honig v. Doe,* 484 U.S. 305, 327 (1988). "Administrative remedies are generally inadequate or futile where plaintiffs allege structural or systemic failure and seek systemwide reforms." *Ass'n for Cmty. Living v. Romer,* 992 F.2d 1040, 1044 (10th Cir. 1993). Kansas' no-aid-to-religion statute is "so serious and pervasive that basic statutory goals are threatened." *Hoeft v. Tucson Unified Sch. Dist.,* 967 F.2d 1298, 1304 (9th Cir. 1992). Meeting S.B.'s "needs" or "other educational needs" under the IDEA can never be accomplished because of 72-3463. Declaring 72-3463 unconstitutional would surely effect Kansas' entire statewide system of meeting exceptional student's "other educational needs" of religion and religious instruction, the development of IEPs to meet those educational needs, as well as the delivery of special needs services in all of the activities that the no-aid statute prohibits.

to learn, imitate, and also replicate the nature and character of the Messiah Jesus Christ and to spread the Christian Gospel. Another reason for school choice is the flip side: a government school, particularly encumbered by the constraints of 72-3463, could never acknowledge any of those things in the first instance as a legitimate educational need of a student.  The second follows: even if a Kansas government school could acknowledge any of those educational needs, it would not – could not – ever meet those needs because of the unconstitutional *no-aid-to-religion* statute 72-3463.

Overlay those impediments to the Kansas exceptional student who is entitled to have an IEP designed to meet what this government school says it will not do in delivering *all* of his educational needs – not merely the ones the Kansas Commissioner Randall Watson will allow BVLY to acknowledge. U.S.C. § 1412(a)(10)(A)(vi)(II), 34 C.F.R. § 300.138(c)(2), and K.A.R. 91-40-48 are facially constitutional and can be perfectly harmonized with providing special education and related services in religious private schools in a "neutral," "secular,' and "nonideological manner" while doing so during the private school's religious curriculum – or any of the activities 72-3463 prohibits.  BVLY misapplies these authorities claiming "federal law will continue to require BVLY to engage in exactly the same conduct (refusing to provide special education services containing religious content) that Baker claims is the source of her injury."  ECF 120, p.20. The salient points are twofold – BVLY says it will continue to enforce the conditions of 72-3463 and the second point: BVLY continues to misstate what is expected or required to do

(delivery of special education services "containing religious content").  BVLY says that "K.S.A. 72-3463 governs the conduct of third parties." ECF 120, p.27. Irrespective of exactly who "third parties" refers to, BVLY is correct in this sense: BVLY, with its teachers and therapists, are mandated to conduct themselves in denying special needs services to S.B. because of the *no-aid-to-religion* statute. BVLY goes on to repeatedly misstate what 72-3463 requires: "K.S.A. 72-3463 prohibits public school personnel from providing special education services *involving religious elements*." ECF 120. p.23.  ***No it doesn't.***    BVLY baldly misinterprets 72-3463 as being necessary: without it BVLY would "provide religious instruction to S.B." ECF 120, p.7.  Another untruth.  BVLY then claims its teachers cannot be required to provide special needs services in a religious curriculum because they might find this personally "abhorrent" or would not agree with the task.  *Id.*  That is also not true. If BVLY's theory was correct, disabled deaf students couldn't have a deaf interpreter during Catholic Mass because the interpreter didn't agree with Roman Catholicism or the priest's sermon that morning.  This argument has no legal merit.  Providers of special education services are not required to endorse religion or conform to any belief in providing those services. Merely because they may even convey a religious message does not mean it is still not neutral and secular as the Supreme Court in *Mitchell* informs this Court.

As hard as the script writers for BVLY try in rewriting the statute with its Chicken Little sky-is-falling imagined false scenarios of teacher oppression or proselytizing, putting aside the limitations of the IEP imposed by 72-3463, once the

IEP is created, delivery has nothing to do with the *content* of the services – what is actually contained in the *delivery* of the service. Providing services during a religious curriculum does not mean the secular purpose of the services is changed to religious. Terri is not expecting any special education services to be delivered "infused with" any religious content – only that those services be delivered in a neutral and secular fashion *during* S.B.'s religious curriculum and other activities.[5] *Mitchell* and *Zobrest*[6] demonstrate that principle of a secular and neutral delivery in the midst of religious activities. The special needs deaf interpreter, while interpreting in Catechism or Mass for her student, is not delivering "religious content."[7] As *Zobrest* recognized, providing a deaf interpreter used by the student for religious purposes during the student's religious activities is still "neutral," stating that the "IDEA creates a neutral government program dispensing aid not to schools but to individual handicapped children." *Zobrest at* 13-14. Providing services during a religious curriculum is not providing "religious instruction" under the BVLY playbook. And BVLY cites all of the

---

[5] BVLY is misinterpreting U.S.C. § 1412(a)(10)(A)(vi)(II), 34 C.F.R. § 300.138(c)(2), and K.A.R. 91-40-48 as prohibiting the same things that 72-3463 does which is an *as applied* challenge made by the plaintiff. This calls for the Court to declare their proper application which does not include what 72-3463 prohibits.

[6] *Mitchell v. Helms*, 530 U.S. 793, 825 (2000); *Zobrest v. Catalina Foothills School District*, 509 U.S. 1 (1993).

[7] BVLY is advocating for what the *Zobrest* district court errantly ruled. *See In Zobrest v. Catalina Foothills*, 1988-89 EHLR 441:564 (D.Ariz., July 19, 1989) ("the provision of a publicly-paid sign language interpreter at Salpointe, a pervasively sectarian school, would violate the separation of church and state… The interpreter would act as a conduit for the religious inculcation of James – thereby promoting James's religious development at government expense").

old *Lemon* based analysis that no longer applies.[8]  These citations show BVLY's understanding of the jurisprudence in this area to be a half-century out-of-date. This secular-not-converted-to-religious principle is not remarkable as the Supreme Court held in 1986 when a Washington state law was enacted to "assist visually handicapped persons to … obtain the maximum degree of self-support and self-care" still had an "unmistakably secular purpose," even though the "amount of the aid awarded under the program was likely to flow to religious education." *Witters v. Washington Department of Services for the Blind,* 474 U.S. 481, 483, 485-86 (1986) (blind student free to use public vocational assistance to attend bible college).  BVLY's playbook is way outdated.  Public or private employees therefore can perform their respective jobs, just as the deaf interpreter, in a completely secular and neutral fashion while doing so in S.B.'s religious activity or curriculum. *See Agostini v. Felton*, 521 U.S.203 (1997) (public school teachers sent into parochial schools during regular school hours to provide education not a violation of the Establishment Clause).  This is not about Terri "dictating" the content of S.B.'s IEP.  Rather it is about what BVLY is not willing or able to do (because of 72-3463) in designing an IEP to meet S.B.'s unique educational needs.  BVLY demeans any notion that S.B. could ever have a legitimate moral or religious "educational need" saying they are mere "tastes, preferences, ideological or religious commitments of the parents." ECF 120, p.33.

---

[8] *Herdahl*, *Schempp*, and *Berger* cited rely upon the *Lemon* test.  *Lemon* was "long ago abandoned" in favor of a test focusing on "historical practices and understandings" in *Kennedy at* 2427-28; *Groff v. DeJoy,* 600 U.S. 447, 470 (2023) (unanimously recognizing *Lemon* as "now abrogated" by *Kennedy*).

This is a true but sad "godless" perspective by this secular humanist philosophy as to any human being actually having a need for God – in this case a 10 year old boy having a legitimate educational need for religious instruction. BVLY tells Terri – "sure, you can have your religion – just keep it tucked in a closet at home."  BVLY remains in its own godless echo chamber and seeks to keep S.B. there as well. Removing Commissioner's Watson's Handbook requirement[9] with its statutory unconstitutional impediment means BVLY can consider and design an IEP for S.B. to meet all of his educational needs as it is required to do – including moral and religious ones – and then will permit BVLY to deliver those services "in connection with" all of the activities 72-3463 had prohibited.[10]

### "PUBLIC" IN A "FREE APPROPRIATE PUBLIC EDUCATION" IS NOT LIMITED TO "GOVERNMENT EDUCATION"

Upon the demand of the Kansas Commissioner's Special Education Handbook, BVLY errantly asserts the Individuals with Disabilities Education Act (IDEA) obligation upon it means it only design an IEP while omitting the moral or religious educational needs of S.B. BVLY unabashedly proclaims because of 72-3463, that the "only way to get publicly provided special education services that are incorporated into the student's overall curriculum is to be enrolled at the local public school, where the district that designs the special education services also controls the curriculum." ECF 120, p.34.

---

[9] If a party the Court could enjoin KDSE from telling BVLY to enforce 72-3463.
[10] The statute does not only limit services *during* those activities but instead prohibits "*in connection with*" which expands the application well beyond delivery conduct.

This position is completely contrary to IDEA and ignores what BVLY disdains as S.B.'s "educational needs" which are religious.[11]  It contends BVLY only provide services during what is called a "State Curriculum" – a curriculum that would only be applicable in a government school setting.  BVLY says it alone "controls the curriculum."  Thus, not only will BVLY not provide services in connection with any of those activities it deems "religious" (which is above Dr. Schmidt's "paygrade" to determine), it will not design an IEP for S.B. to meet his moral and religious "other educational needs."  BVLY claims the IEP curriculum must be sterilized of all S.B.'s educational needs of the religious kind. BVLY has it wrong.

What is the point of an IEP – or Terri's right to school choice – when it is boxed into the construct nature of a government school?  The IEP is designed to assist far beyond the confines of government's limited curriculum or a government school building into "homes" and "hospitals," and literally everywhere not named a government school.  So S.B. is the Child of a Lesser God – he can't even get scraps from the master's table of a full-service IEP in which BVLY never acknowledges or addresses S.B.'s moral and religious needs. BVLY says it cannot do this because of Constitutional constraints which is of course beyond the jurisdiction of any due process hearing officer.  If identifying religious business is "above Blue Valley's pay grade" then by all means BVLY has the opportunity to pay for religious private school

---

[11] Which counts both as "general" education needs as well as "other" needs of S.B. *See* 20 U.S.C.§ 1414(d)(1)(A)(i)(II)(bb) (the student's IEP academic and functional goals must "meet each of the child's other educational needs that result from the child's disability"): K.S.A. 72-3429; ECF 121-2 (Handbook), p.79.

tuition to handle those duties it cannot provide or eschew to provide. BVLY refuses to acknowledge the distinction between its own government-constrained curriculum and those of a private school. It also fails to see the difference in simply providing services to S.B., irrespective of curriculum, in connection with the activities 72-3463 prohibits. S.B. is not requesting that BVLY alter its secular educational curriculum at all for S.B. Plaintiffs are not seeking to modify BVLY's own curriculum – rather Terri seeks the right to send S.B. to a private religious school and to provide a religious education with the aid of otherwise generally available public funds. BVLY has a right to provide a strictly government education which Terri calls "godless" all day long to parents who choose, as any Kansas American can, to elect government education. But BVLY still cannot limit its delivery of special needs services to S.B. to its "State curriculum" imposed upon a private school curriculum.[12] This defeats the entire purpose of school choice as well as treating Terri unequally. S.B. has a right to his unique IEP designed for S.B. to make progress in the chosen curriculum of his private school which the IDEA and Kansas school choice provide for.

---

[12] BVLY's red herring argument about curriculum conflates its right to have its own secular government-kind of curriculum with Terri's right to choose a different curriculum in a private school setting. BVLY cites *Bauchman v. West High Sch.,* 132 F.3d 542 (10th Cir. 1997) for the proposition that its curriculum is off limits. ECF 120, p.28. Terri readily recognizes BVLY cannot meet S.B.'s moral and religious educational needs in a government school utilizing its government curriculum. Since BVLY will not or cannot alter its government curriculum to meet S.B.s religious and moral needs, private placement is the solution. K.A.R. 91-40-21(b) (agency shall ensure that a continuum of alternative educational placements is available to meet the needs of children with disabilities). The authority for meeting S.B.'s needs is the IDEA – not the First Amendment. *Bauchman* has never been cited in special education case law.

BVLY argues that Terri has failed to allege that she was denied FAPE because of her religion. But BVLY is very much mistaken.  It is well established that a State fails to provide a FAPE not only when instruction is inadequate, but also when the educational environment is insufficient to allow for adequate educational progress in light of the student's individual needs and circumstances.  BVLY freely admits it will not – cannot – accommodate the religious educational needs of S.B. during the school day – and at any location or during any curriculum. Because S.B. experiences a unique set of challenges that can materially interfere with his education, many public and nonsectarian schools are unable to provide him with a FAPE.  BVLY unabashedly declares its inability to address S.B. educational needs of the moral or religious type. There is no home, school, or facility for S.B. to be placed in which he can receive FAPE while meeting his unique religious educational needs: BVLY plays an overwhelmingly significant role in that failure.  BVLY says it cannot (actually never) will meet S.B.'s religious education needs in its State curriculum – that's OK because Terri can choose a different curriculum and the IEP team can design an IEP to meet those particular needs which can be delivered into a private school curriculum.

Not only will BVLY not design an IEP to meet S.B.'s educational needs of the religious type, it is unable to even recognize them as being legitimate because of the Commissioner's Handbook enforcing 72-3463. Under BVLY's interpretation, no child in its school district has any educational need for morality of the religious standard in any aspect. BVLY is not required to provide S.B. any religious instruction at all –

only design an IEP that will assist S.B. during that religious curriculum provided by a non-government school.

BVLY asserts the IDEA public benefit program means it is only valid in an education program of the government secular kind – a "State Curriculum." BVLY's argument that the "benefit she contends she was denied – the right to have S.B.'s special education curriculum customized to the curriculum of S.B.'s private school – is in fact a benefit denied to everyone"[13] is not true. It shows a fundamental misunderstanding of what "public education" and a "general education" curriculum is under the IDEA. For those students who have no religious educational needs, they all benefit. But for those students who have different educational needs related to religion, those students do not get the same treatment. BVLY is wrong. The IDEA does not require that a private school provide a "public education" defined by BVLY as the kind a Kansas government school provides. FAPE only means "public expense" and under "public supervision" – not what BVLY calls "public" education. *See* 20 U.S.C. § § 1401(9)(a) (FAPE is a special education "provided at public expense, under public supervision and direction, and without charge"). The fundamental flaw in BVLY' position is its misinterpretation of "public" in the phrase "free appropriate public education." BVLY misinterprets what "public" means and then concludes that any "general educational curriculum" only means its "government" education – versus a "private education" – curriculum. BVLY does not have the authority to "control the curriculum" in private schools. "Free appropriate public education" is a

---

[13] ECF 120 p.35.

"term of art." *Peter v. Wedl*, 155 F.3d 992, 999 (8th Cir.1998); *Cefalu v. East Baton Rouge Parish Sch. Bd.,* 103 F.3d 393, 396 (5th Cir.1997); *Dreher v. Amphitheater Unified Sch. Dist.*, 22 F.3d 228, 233 n.10 (9th Cir. 1994). The word "public" in a "free appropriate public education" does not refer to government education at public schools, but instead is "a term of art which refers to 'public expense,' whether at public or private schools." *Dreher* at 233. KSDE Commissioner Watson was specifically questioned about his interpretations of his agency's regulations – "general education curriculums" are in the private schools and IEPs should be designed to assist the exceptional child to make progress in that private school's general education curriculum:

> Parents choose private schools so they can have religious kinds of instructions integrated in the general education curriculum. ECF 121-11, Ex. 10 p.144:24-p.145:5.
> A private sectarian school has a general education curriculum which a parent can go to the school IEP team and ask for an IEP to make progress in that school's curriculum. ECF 121-11, Ex. 10 p. 152:22-p.153:7.
> An IEP is designed so that the exceptional child can make progress in the general education curriculum of the private religious school. ECF 121-11, Ex.10 p.153:4-7. Whether a child is enrolled in a private or a public school the IEP should help that child make progress in that particular general education curriculum. ECF 121-11, Ex.10 p.144:3-15.

For sure, Dr. Schmidt disagrees but the Commissioner's interpretations trump his. And another sure thing: BVLY can have what Terri calls its "godless" government curriculum which Terri is not looking to have changed. Instead, the Court must declare 72-3463 unconstitutional so that BVLY will acknowledge S.B.'s religious educational needs as legitimate, consider designing an IEP so that S.B. can make progress in his general education curriculum in his religious private school, and

then deliver those services irrespective of whether any of the 72-3463 activities are occurring.

**NEITHER TERRI NOR A PRIVATE SCHOOL IS REQUIRED TO PROVIDE A "STATE EDUCATION" TO S.B. IN ORDER TO RECEIVE FAPE**

So BVLY contends that FAPE only concerns a "government education" it defines as wholly excluding a religious private curriculum and therefore asserts it only is obligated to create an IEP for S.B. in its own government curriculum rather than that in a "private" educational curriculum. BVLY contends that an IEP can only be designed to conform to its State kind of curriculum and standards. But non government schools in Kansas do not provide a public education that conforms to the State's curriculum and standards at all. *Carson* reiterated that the Free Exercise Clause prohibits a state from creating a public benefit (services or public funds for curricula) and then excluding otherwise eligible recipients based upon their intent to use the benefit for religious instructions. *Id.* at 789. The relevant question when applying *Carson* is whether the "educational experience[]" at nonpublic schools is "equivalent" to the educational experience in Kansas government schools. *Carson*, 142 S. Ct. at 1999. As it turns out, nonpublic schools do not have to provide an education that is even a rough equivalent to that provided in Kansas government public schools. By design, Kansas private schools do not provide the "equivalent" to the educational experience in Kansas government schools. Putting aside the fact that private schools may do all of the things that 72-3463 prohibits, they may also (1) be single-sex, (2) impose restrictive admissions criteria, (3) be located outside of Kansas, and (4) teach classes through an ideological lens inconsistent with the secular

20

curriculum in government run public schools.  These nonpublic schools thus do not provide a government-kind of education that conforms to Kansas' government school curriculum and standards. Yet, BVLY imposes the No-Aid Provision of 72-3463 to make Terri and her son second class status because Terri and her school is religious. In contrast to this otherwise tailored approach to the differing needs of families and students, Kansas categorically prohibits all students from obtaining the benefit of an IEP and services in any public or private school placement.

### FAPE IS A GOVERNMENT BENEFIT – IT DOES NOT REQUIRE A PARENT TO BE A GOVERNMENT SCHOOL CURRICULUM ADJUNCT

BVLY argues that anywhere and anytime it provides special needs services that place and that person must be a *de facto* adjunct of BVLY's own government curriculum. This is not what is required under the IDEA. The IDEA is designed to "provide for the education of all children with disabilities" and eradicate the historical discrimination preventing children with disabilities from receiving a mainstream education – or any education at all. 20 U.S.C. § 1400(c)(2), (d)(1)(C).  To achieve these goals, IDEA offers federal funding to states to "ensure that all children with disabilities have available to them a free appropriate public education," known as a FAPE, "that emphasizes special education and related services designed to meet their unique needs." *Id*. § 1400(d)(1)(A).  A student's IEP is "a written statement for each child with a disability" that covers, *inter alia*, a "child's present levels of academic achievement and functional performance," "a statement of measurable annual goals, including academic and functional goals," and "a statement of the special education and related services and supplementary aids and services … to be provided to the

child, or on behalf of the child." *Id.* § 1414(d). The IEP is "the centerpiece of the statute's education delivery system for disabled children." *Honig* at 311.

The IEP is developed by an IEP team that consists of the child's parent(s), the child's general education teacher, the child's special education teacher/provider, a Local Education Agency (LEA) representative, and an individual who can interpret the instructional implications of assessment results. *See id.* § 1414(d)(1)(B); 34 C.F.R. § 300.321(a)(1)-(5). Parents do not dictate the content of the IEP, but they play a "critical" role in its development and implementation. *Doug C. v. Hawaii Dep't of Educ.,* 720 F.3d 1038, 1043 (9th Cir. 2013). They "not only represent the best interests of their child in the IEP development process, they also provide information about the child critical to developing a comprehensive IEP and which only they are in a position to know." *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.,* 267 F.3d 877, 882 (9th Cir. 2001).

BVLY refers to "private" services but does not identify what it is actually talking about. IDEA provides four different methods for obtaining public funding support for a child with a disability: (1) public school placement pursuant to an IEP under 20 U.S.C § 1412(a)(1);[14] (2) private school placement pursuant to an IEP under 20 U.S.C. § 1412(a)(10)(B);[15] (3) private school placement without an IEP but with

---

[14] The first method is placement of the child at a public school pursuant to an IEP where the child is guaranteed a FAPE, and the public school follows the IEP Team's IEP to provide special education services tailored to the child's needs, at no cost to the parents. 20 U.S.C. § 1412(a)(1).

[15] The second method is placement of the child at a private school pursuant to an IEP. 20 U.S.C. § 1412(a)(10)(B). As in government school, the child is guaranteed a FAPE, and the private school follows the IEP to provide special education services tailored

the possibility of reimbursement under 20 U.S.C. § 1412(a)(10)(C);[16] and (4) private school placement without an IEP or the possibility of reimbursement, under 20 U.S.C. § 1412(a)(10)(A).[17]  Placements made pursuant to § 1412(a)(1) and § 1412(a)(10)(B) still require the application of 72-3463 according to the Court's prior ruling. The different methods are summarized in the following chart:

| Statute | School Type | IEP Implemented | Level of public funding |
|---|---|---|---|
| § 1412(a)(1) | Government | IEP implemented | Full funding of FAPE guaranteed |
| § 1412(a)(10)(B) | Private | IEP implemented | Full funding of FAPE guaranteed |
| § 1412(a)(10)(C) | Private | IEP developed but parents object | No FAPE guaranteed; parents may seek reimbursement[18] |
| § 1412(a)(10)(A) | Private | No IEP developed | No FAPE available; child may be given equitable services |

to the child's needs "[a]t no cost to the parents." 34 C.F.R. § 300.146(a)(2). Thus, such children "ha[ve] all of the rights of a child with a disability who is served by a public agency." *Id.* § 300.146(c).

[16] The third method is placement of the child at a private school by the parents after an IEP has been developed by the IEP team, but the parents believe the IEP does not provide FAPE. 20 U.S.C. § 1412(a)(10)(C). The parents then place their child with a private school, pay for tuition and special education services, and seek reimbursement from the LEA through a contested "due process" administrative proceeding. 34 C.F.R. § 300.148(b). While in the private school, the child is not entitled to a FAPE or IEP. A court or hearing officer can order an LEA to reimburse parents for placements in religious schools through this process.

[17] The fourth method is placement of the child at a private school by the parents at their own expense without any development of an IEP. 20 U.S.C. § 1412(a)(10)(A). An LEA may provide "equitable services" to these students through "employees of a public agency" or "through contract by the public agency with an individual, association, agency, organization, or other entity." 20 U.S.C § 1412(a)(10)(A)(vi)(I)(aa)-(bb). However, no such child "has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school," including an IEP. 34 C.F.R. § 300.137(a).

[18] The private expense duty imposed by K.S.A. 72-3411 would only apply to the third §1412(a)(10)(C) method of private placement without FAPE and the statute also requires services designated in the child's IEP. Placements made pursuant to § 1412(a)(1) and § 1412(a)(10)(B) still require the application of 72-3463.

Parents are not permitted to deem any and all provisions of education to a child and label it "special education" or "related" services when they are not delivered by qualified individuals. The Kansas appellate court decision is intermingled with the interpretation of Federal Law. There is no explanation as to why only one statutory requirement (72-3463) does not apply to the private duty services at the parent's expense when other statutory requirements do. But if 72-3463 evaporates why doesn't the other statutory requirements disappear as well – including the private duty statute? And if none of the statutory or regulatory requirements are imposed on the parent in providing the special needs services designated in her child's IEP privately, it is unknown how the parent could seek reimbursement under 20 U.S.C. § 1412(a)(10)(C) when not complying with any of the statutory requirements that would meet the definition of a proper delivery of special education services. This Court determines what Federal Law requires – not an unpublished Kansas Court of Appeals decision. Either the federal requirements all apply or none apply – there is no rationale as to why one statutory requirement (72-3463) does not apply while all the others Kansas statutes tracking federal regulations do.

To summarize, the only way for a child to receive the guarantee of a FAPE and the corresponding panoply of individualized IEP services is to be placed in a government school under 20 U.S.C. § 1412(a)(1) or a private school under 20 U.S.C. § 1412(a)(10)(B). Otherwise, children are entitled only to "equitable services" – which may result in no services at all, 20 U.S.C. § 1412(a)(10)(A), or parents must front the

expenses of costly services and hope for (often partial) reimbursement after a protracted administrative proceeding, 20 U.S.C. § 1412(a)(10)(C).

### PLACEMENT IN NON-GOVERNMENT SCHOOLS

Consistent with IDEA's requirements, Kansas law guarantees the substantive right to a FAPE for all eligible students. And like IDEA, Kansas says FAPE may be provided pursuant to an IEP in non-government schools if no appropriate public education program is available.[19] BVLY says it cannot provide an appropriate public education program for S.B. because of his religious educational needs. Kansas defines non-government schools as a "private" school that enrolls individuals with exceptional needs pursuant to an IEP.[20] Placement in a non-government school is facilitated through a contract.[21] Many non-government schools have unique elements tailored to the students individual needs. Kansas recognizes a diverse range of non-government schools that use unique practices, pedagogies, and non-government curricula that are individually suited for their students. BVLY argues that the IDEA imposes a cram down of government framed curricula into these non-government schools. BVLY has it wrong. And receiving guaranteed, tailor-made services through an IEP at a private school is far superior to the mere hope of obtaining some amount

---

[19] K.A.R. 91-40-21(b) ("shall ensure that a continuum of alternative educational placements is available to meet the needs of children with disabilities").

[20] K.A.R. 91-40-43 (Services to private school children); 91-40-41 (Private school placement by parents to obtain FAPE); 91-40-48(a) (agency may use state and federal funds…to provide special education and related services to exceptional children enrolled in private schools….").

[21] *See* 91-40-42a(B)(4)(A) ("How, where, and by whom special education and related services will be provided to private school children, including a discussion of the means by which services will be delivered, including direct services and services through contracts").

of "equitable services" under Section 1412(a)(10)(A), or having to attempt *post-hoc* reimbursement under Section 1412(a)(10)(C) with no guarantee of any reimbursement. Only private school placement at a nonpublic school pursuant to an IEP guarantees access to all the services necessary for students with disabilities to receive an education.

### BLUE VALLEY'S TAKE-IT-OR-LEAVE-IT PLAY BOOK "SOLUTION"

The extensive coercive nature of the statutory framework is evident. S.B. must attend a "school" – a particular private school – to receive FAPE or any other kind of special needs and related services. In a government school, S.B. cannot do anything deemed "religious" while receiving those services. To receive FAPE in a private school, the same conditions apply. If Terri won't agree to those conditions, she is required to provide all of the services at her own financial expense.[22] All of that, in any combination, pressures Terri to forego her exercise of religion, right to parent S.B., and to have religious autonomy in her teaching choices. The Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions" and the "liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Trinity* at 2022. BVLY makes the remarkable false factual contentions that "Baker, who is neither homeschooling S.B. nor sending him to a religious school, does not have standing to make this challenge." ECF 120, p.17.[23] But having made that contention

---

[22] Kansas omits providing a "means test" to determine whether a parent is even financially able to provide all of the services designated in their child's IEP.

[23] BVLY incorrectly contends that "S.B. currently attends a secular private school, Freedom Learning Academy" (ECF 120, p.15) when S.B. does not. S.B. currently

BVLY knows S.B. must be sent to a school – and sent to a particular kind of private school – to comply with the mandatory attendance laws and then to have special needs services delivered.  There is plenty of penalty to Terri in being reported by BVLY for not providing the special needs services. There are multiple injuries at work.

"Religious activity" is not objectively defined. This is entanglement. The "Bible is worthy of study for its literary and historic qualities." *School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 299, (1963)   Religious texts may be used. *See* S*tone v. Graham*, 449 U.S. 39, 42 (1980) ("the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, and the like").  But under 72-3463 anything *connected* to religion counts.  And then there is the issue of S.B.'s ability to use or convert a Bible reading into his own religious devotion or religious curriculum while in the government or private school.  State actors cannot treat one faith's religious practices as "religious in nature" and another's practices as "secular in nature."  *Fowler v. Rhode Island,* 345 U.S. 67, 70 (1953) ("To call the words which one minister speaks to his congregation a sermon, immune from regulation, and the words of another minister an address, subject to regulation, is merely an indirect way of preferring one religion over another").BVLY glibly claims that all Terri need do is forego FAPE and provide the same services at her own substantial financial cost for the next 8 years. ECF 120, p.36 ("Baker can opt

---

attends The Daniel Academy since the beginning of this 2024-2025 school year as well as Heritage House.

out of the public provision of special education services by privately providing them, as permitted by K.S.A. 72-3421, or opt out of the special education system entirely by withdrawing her consent"). BVLY repeatedly uses the phrase "opt out" as its get-out-of-jail card but there is no exit for Terri in the Special Needs highway established by Kansas statute.

BVLY claims "K.S.A. 72-3463 does not require Baker to either engage in or refrain from any action. She remains free to engage in (or decline to engage in) whatever practices she wishes to and to profess (or decline to profess) whatever beliefs she wishes." ECF 120, p.27. So BVLY says it gets a free pass because Terri gets to choose. So sure, Terri can practice her religion and choose to be denied these benefits by doing so. And of course, Terri can choose to "opt out" of receiving the special needs benefits for S.B. if she wants to have religious autonomy, parental rights, and to exercise her religious convictions. These "choosing" excuses are the classic "special disabilities" BVLY imposes on Terri because of her religious exercise and religious status. Like *Fulton*, BVLY is burdening Terri's religious exercise "by putting [her] to the choice of curtailing [her] mission" or adopting policies and practices inconsistent with her religious beliefs. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1875-76 (2021).

All of BVLY's arguments are the same as made in *Trinity Lutheran* which were rejected: "Of course, Trinity Lutheran is free to continue operating as a church … but that freedom comes at the cost of automatic and absolute exclusion from the benefits of a public program for which the Center is otherwise fully qualified." *Id.* at 2022.

"Opting out" is just another way of saying Terri need not apply to BVLY for FAPE. BVLY's "opt out" choice for Terri is a classic Hobson's kind of choice: provide all of the FAPE services at her own expense – or utilize FAPE – on the anti-religious-use-restrictions BVLY imposes. This shunts religious parents into sub-optimal alternative methods which fails. Otherwise, governments could always exclude religion from their flagship initiatives as long as a separate-but-inferior program with fewer benefits remained available. Such "religious gerrymanders" are not allowed under the First Amendment. *Carson* at 2000 (quoting *Walz v. Tax Comm'n,* 397 U.S. 664, 696 (1970). BVLY's religious discrimination cannot be upheld on the theory that it is trying to "ensure that the limits of the federal program are observed." A*gency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 215 (2013) ("Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise").

Thus even BVLY's "take-it-or-leave-it" solution is not only an unconstitutional denial of benefits and coercion to her religious beliefs, there is no "leave it" avenue for Terri at all  BVLY is all wrong about Terri playing a trump card of "withdrawing consent."  Although the IDEA allows for Terri to unilaterally withdraw consent, Kansas does not permit it. *See* K.A.R. 91-40-1 (Definitions) (I)(3)(C) ("The parent may revoke consent in writing for the continued provision of a particular service or placement ***only if the child's IEP team certifies in writing that the child does not need the particular service or placement*** for which consent is being revoked in order to receive a free appropriate public education") (*emphasis*).  *See* K.A.R. 91-

40-27(4)(k) (unless the IEP "certifies in writing that the child does not need the service or placement for which consent is being revoked").

BVLY's argument runs headlong into the facts of *Carson* where those parents there similarly *opted into* Maine's public school system. Terri has enrolled S.B., in the BVLY district, as she must, in order to receive FAPE.  Like Terri, those Maine parents could have sent their children directly to private school at their own expense but instead they looked to participate in Maine's publicly funded educational-assistance program. They were rejected because the school they chose was religious.  *Carson* at 1994-95. As in *Carson*, the solution is not for Terri to pull S.B. out of BVLY enrollment or to try to withdraw consent for services; it is to remove the unconstitutional no-aid restriction in the Commissioner's Handbook (72-3463) that is barring Terri from participating on account of her religion and exercise of school choice. Terri cannot be forced into a second – or third – best option simply because of her religion.[24]

### FUTILITY

BVLY contends that Terri "has never made a specific request for any particular special education services to be provided by BVLY at a particular private school." ECF 120, p.39.  It asserts that Terri "does not actually demand that BVLY provide S.B. with special education services with religious content." *Id.* at p.13.[25]  The

---

[24] *See Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1595 (2022) ("government may not treat religious persons, religious organizations, or religious speech as second-class").
[25] "With religious content" that part is true as special education services should be delivered without "religious content." Terri has religious content covered. All BVLY need to do is to simply deliver services while the religious content originates from Terri and her private school. The services remain neutral even though delivered in connection with S.B.'s religious curriculum.

Supreme Court has long held that litigants need not begin the process of applying for something from which they are categorically excluded to establish injury in fact. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 365 (1977). BVLY has effectively posted a "Nonsectarian Schools Only" sign rather than a "Whites Only" sign, but the analysis remains the same. Terri is not required to engage in a futile and meaningless request to BVLY for it to do something it has declared it will never do and cannot do because of the Commissioner's Handbook and 72-3463. BVLY has declared it will never design an IEP to meet S.B.'s religious educational needs or to provide them in connection with the activities listed in 72-3463 in any setting – public or private. That is a controversy and injury to Terri and S.B.

### UNEQUAL PROTECTION AND BURDEN TO RELIGION AND RIGHT TO PARENT WITH AUTONOMY

BVLY is tasked with ensuring that S.B. receives his special needs services – wherever S.B. is. BVLY has reporting duties. S.B. is not receiving all of the services designated in his IEP. According to BVLY, S.B. is not even attending the right kind of school. The plaintiff is subjected to unequal treatment with the Kansas requirements that because S.B. is an exceptional child, Kansas imposes additional requirements that other school aged children are not subjected to. Under the definition of K.S.A. 72-3461(C) and the Kansas Commissioner's Handbook, because private school choice has been elected by his mother Terri, S.B. is required to be enrolled in "an organization which regularly offers education at the elementary or secondary level, which is exempt from federal income taxation under section 501 of the federal internal revenue code of 1954, as amended, which conforms to the civil

rights act of 1964, and attendance at which satisfies any compulsory school attendance laws of this state."

BVLY sidesteps the issue by claiming it does not exclude "religious" schools (of the kind that actually does not do religious things) – but provides no explanation why these requirements do not violate Equal Protection or even have a rational explanation.  BVLY claims no action is required by Terri but it is sorely mistaken – Terri must enroll S.B. in this type of school to comply with the compulsory school attendance law. This requirement burdens all of the Constitutional rights of Terri previously cited above regarding exercise of religion, religious autonomy, and the right to parent. There is no compelling state interest in imposing these requirements, much less a rational basis. Why must S.B.'s school be an "organization" or "regularly offers" or is exempt from federal income tax when other private schools for other students are not?  Why must S.B.'s school conform to the civil rights act of 1964? There is no reason why other students can fulfill Kansas mandatory attendance via other accredited and non-accredited private schools not meeting this requirement while exceptional children cannot. Other students can attend all kinds of privates schools – including what the Kansas Commissioner calls "homeschools" which only are required to be registered and have a designated records custodian.  There is no requirement that any private school be organized as a corporation or an LLC unless it is one in which a special needs student attends.

### EXHAUSTION NOT REQUIRED

BVLY claims anything related to special needs services must go through an administrative exhaustion requirement.  ECF 120,p.38.  All offers of FAPE to S.B. contained the unconstitutional poison pill of 72-3463. But the relief the plaintiff seeks regarding the Constitutional violations are not available under IDEA. *See Heldman v. Sobol,* 962 F.2d 148, 159 (2d Cir. 1992) (concluding exhaustion futile regarding a regulation implementing a state statute that neither the hearing officer nor the Commissioner of Education had the authority to alter). The review officer BVLY cited questioned whether BVLY's repeated actions in removing S.B.'s status as an enrolled student was a subject for a due process hearing officer in the first instance. *See* ECF 13-3, p.3 ("parents provided no information on how these enrollment difficulties are within the jurisdiction of a Special Education Due Process request"). A due process hearing officer cannot declare a statute unconstitutional. *See Pierce v. Chene*, No. 1:15-cv-758, 2017 WL 3600458 (D.N.M. Feb. 1, 2017) (recognizing no exhaustion required for First Amendment claims).  BVLY makes no argument as to how a hearing officer can declare K.S.A. 72-3464 unconstitutional or to address any of the Constitutional violations asserted.

### DENIAL OF AN EDUCATION

There is also the issue of BVLY refusing to do what public schools are supposed to do: provide education to school aged children in its district.  While a due process hearing officer can address special needs services, that officer has no jurisdiction to address BVLY's actions regarding simply providing an education to S.B. That is an

injury to Terri and S.B. outside of the special needs statutory framework.  As to providing special education services, the facts of this case somewhat track those in *Chavez v. New Mexico Public Education Department,* 621 F.3d 1275 (10th Cir. 2010). In that case, the school district unilaterally un-enrolled the sixth grade student with autism because the district said the student had not attended school for a period of weeks.[26] *Chavez* stated that:

> And, in a different case where… from the outset, their child was deprived completely of a FAPE, they might have been able to file a federal court action for an injunction much earlier, noting the clear, imminent harm if a child is not provided any education by his LEA during the administrative process. This is a difficult and frustrating case, where we have sought to balance useful procedural requirements with the need for expedition. We do not, however, intend to signal state agencies that they may routinely rely on procedural requirements to insulate them from all liability, where the statutory remedies have run off the rails.

*Id.* at 1290.

### S.B.'S IEP CAN BE RE-EVALUATED WITHOUT TERRI'S PARTICIPATION

BVLY says its hands were and are tied because Terri would not just show up at a school – while BVLY refused to enroll S.B. – or to have S.B.'s IEP re-evaluated – which also requires enrollment.  BVLY was not prohibited from re-evaluating S.B.'s IEP.  BVLY made an effort. BVLY can re-evaluate S.B.'s IEP without parental consent if it has made a reasonable effort. ECF 121-2 (Handbook) Ex. 1, p.16 (citing K.A.R.91-40-27) ("(g) An agency shall not be required to obtain parental consent for a reevaluation or a proposed change in services or placement of the child if the agency has made attempts, as described in K.A.R. 91-40-17(e)(2), to obtain consent but the

---

[26] "This is a most unusual case because M.C. was home-schooled for a significant period of time because of behaviors stemming from his autism and *dropped from the school rolls.*" *Id.* at 1290 *(emphasis in original).*

parent or parents have failed to respond"). BVLY has Dr. Jordan's extensive report. Irrespective of this, it becomes futile as the poison pill of 72-3463 dooms the modification of S.B.'s IEP to even consider his other moral and religious educational needs.

**POSTMORTEM ARGUMENTS**

Ground Zero begins and ends with the Kansas Commissioner's Special Education Handbook and his guidance – actually insistence – that BVLY adhere to 72-3463. The rest of BVLY's arguments are a distraction. But it's hard not to address the bunny trails BVLY urges to the Court to trot down.

Similarly, BVLY's *ready-willing-and-able* mantra is a façade. It comes with its systemic poison pill of the religious-no-aid statute conditions. But first things first: BVLY will not provide any education – "special" or of the general kind – to S.B. unless or until S.B. is enrolled in its school district. Putting aside special services, BVLY locked S.B. out of its education system in prior years including the 2023-2024 school year. Why would this school district be so fixated to unilaterally un-enrolling S.B. without his parent's consent or knowledge? As to enrollment, why did BVLY refuse to enroll S.B. for the 2023-2024 school year? BVLY provides ParentVUE which parents are told to use for enrollment and in which Terri had successfully used to enroll S.B. As to the 2024-2025 school year, BVLY made a 180 degree reversal and enrolled S.B. – using the same ParentVUE website. Why now but not last year? When Terri completed the enrollment process for the 2023-2024 school year, the status told her completed and "under review." Although Dr. Schmidt said ParentVUE

was asking for more steps it did not.  There were no further communications from BVLY.  Enrollment is necessary for many things.  A child cannot just show up ("present") at the school doors and hop into a class – enrollment is first required. Attorney Hillman told Dr. Schmidt S.B. was not being enrolled but yet did not explain to him why.  The Bakers were never told why.  At Dr. Schmidt's deposition he was questioned why – to which he said he wasn't curious as to why and just didn't care to know.

## CONCLUSION

At bottom, BVLY's justifications rely on outdated – or in some cases explicitly overruled – precedent.  Congress passed the IDEA to help parents and their children with disabilities obtain *equal* educational opportunities as their nondisabled peers. IDEA provides federal funding for special education programs in schools across the country to make that possible. Kansas provides parallel state-level special education funding to support students with disabilities.  In Kansas, school choice gives parents the right to access special education funds to help send their children with disabilities to private schools that will best serve their individual needs. BVLY's theory that because it is tasked with the parent in "designing" the IEP or the "special education services" that it therefore "controls the curriculum" is contrary to Kansas school choice and the purpose of the IDEA.  It is also in direct contravention of Commissioner Randall's interpretations.

BVLY's argument that any discrimination against religion is not invidious because (1) religious private schools are not similarly situated to nonreligious private

schools and (2) the law discriminates only against religion and not between religions. Its "similarly situated" argument is not only meritless, it proves the plaintiff's point. The objective of both Kansas school choice and IDEA is to educate children with disabilities in nongovernment schools. The persons regulated are parents and their exceptional children. Religious private schools are similarly situated to secular private schools for purposes of providing an education in all ways relevant to these objectives – in their ability to provide services, abide by legal requirements, and every other aspect of the school choice and IDEA process. The only distinction between the two groups is their religious status and exercise, which makes nonsectarian schools the ideal control group to "isolate the factor allegedly subject to impermissible discrimination" – religion. *Freeman v. City of Santa Ana,* 68 F.3d 1180, 1187 (9th Cir. 1995). Indeed, every one of BVLY's distinctions between private nonsectarian schools and private religious schools rests on religion, proving that religion is the only factor that underlies BVLY's discriminatory treatment. BVLY's own arguments thus prove that private nonsectarian schools are similarly situated to private religious schools in all relevant respects such that any distinctions are drawn based on religious status and exercise.

But the Kansas Commissioner enforcing 72-3463 explicitly bans parents from using that money or obtaining the benefit of that funding when parents send their child to religious private school doing all of the things 72-3463 prohibits, even when those are the schools best able to meet their child's needs. BVLY defends this and is in realty punishing religious parents, their children, and religious schools in its school

district who would gladly accept students with disabilities, simply because the schools that would best meet these children's needs have a religious curriculum and doing things that are religious.

And in the free-exercise context, the Supreme Court has squarely rejected BVLY's arguments such as "cost and efficiency" calling it "basic that no showing merely of a rational relationship to some colorable state interest would suffice," even where the burden is imposed by the state's "placing of conditions upon a benefit or privilege." *Sherbert v. Verner,* 374 U.S. 398, 404, 406 (1963). Rather, "in this highly sensitive constitutional area, only the gravest abuses, endangering paramount interest, give occasion for permissible limitation," id. at 406-07 – and BVLY has identified no such compelling interest here. *See Thomas v. Rev. Bd.,* 450 U.S. 707, 718-19 (1981) (invalidating unconstitutional condition even though the "purposes urged" were "by no means unimportant").

No other state imposes the terms of what 72-3463 prohibits. Placements under § 1412(a)(1) and § 1412(a)(10)(B) for the free stuff – FAPE – still require the application of 72-3463. The Court can also inquire why Kansas – as opposed to the other states – has enacted its unique statutory requirement of "private duty" converting the "free" in FAPE to at-the-parent's-expense. No other states impose this private duty and for good reason. Congress said if a parent doesn't want the "free" then OK. But Kansas says not so fast – Terri can't walk away from the "free" – if she does then the federal free becomes her own onerous financial obligation. This provision actually works as a disincentive punishment for parents to enter into the

world of an IEP as once entered there is no way out unless BVLY's IEP team says the child does not need the services. If a parent doesn't like the IEP services or for whatever reasons objects – tough – because now the parent is captured. Sure, go away Terri but let me first attach this heavy Egypt-curriculum-financial anchor to your ankle. That is not an equal kind of school choice for these parents. And then Kansas loads the parent up with another burden regarding the kind of private school counts. Talk about coercion and burdens to the exercise of parenting, religious autonomy, and freedom of religion. No other state does what Kansas does. Government pays or you pay parent (and we don't really care if you can afford it) – one way or the other government is not going away. In Kansas the parent must accept the poison pill of the Blaine no-aid statute in 72-3463 if the benefit of "free" is to be obtained. And don't expect government to meet any of your exceptional child's "other educational needs" which are religious. 72-3463 is facially unconstitutional as targeting religion for special disabilities. With the statute injected into this system, this Kansas regime is systemically unconstitutional in every aspect of its application from the creation of IEPs to the delivery of special needs and related services.

BVLY is correct that it cannot be liable for punitive damages. U.S.C. § 1412(a)(10)(A)(vi)(II), 34 C.F.R. § 300.138(c)(2), and K.A.R. 91-40-48 are facially constitutional because they can be harmonized with providing special education and related services in religious private schools in a "neutral," "secular," and "nonideological manner" even while and during a religious curriculum – or any of the activities 72-3463 prohibits.

But as to the other issues it seeks summary judgment on, the Court should deny BVLY's motion for summary judgment.     BVLY misapplies U.S.C. § 1412(a)(10)(A)(vi)(II), 34 C.F.R. § 300.138(c)(2), and K.A.R. 91-40-48 to S.B. to prohibit the activities of 72-3463.     72-3463 is unconstitutional.     The Court must declare 72-3463 unconstitutional for all of the reasons stated in the plaintiff's memorandum for summary judgment.     The Court should declare that an IEP team can acknowledge an exceptional child's "other educational needs" which can include his moral and religious educational needs. The Court should declare that an IEP for an exceptional child can include moral and religious needs of the student.     The Court should declare that the IEP can be developed so that the exceptional child can make progress in the students general education curriculum in his private religious school which includes meeting those educational needs of religious instruction.

BVLY's Summary Judgment Motion should be denied and the Plaintiff's Motion for Partial Summary Judgment Granted.

| | |
|---|---|
| /s/Linus L. Baker KS 18197<br>6732 West 185th Terrace<br>Stilwell, Kansas 66085<br>Telephone:     913.486.3913<br>Fax:          913.232.8734<br>Email: linusbaker@prodigy.net<br>Attorney for the plaintiffs | **CERTIFICATE OF SERVICE**<br><br>On this 6th day of December, 2024, the above document was filed with the Court's CM-ECF system which will provide notice to all counsel of record.<br>/s/Linus L. Baker<br>Linus L. Baker |